**BARNES et al. v. UNITED STATES.**

**No. 46774.**

United States Court of Claims.

July 15, 1952.

Herman J. Galloway, Washington, D. C., King & King, Washington, D. C., were on the briefs for plaintiff.

Carl Eardley, Washington, D. C., with whom was Holmes Baldridge, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

Plaintiff sues for increased costs and other damages which it claims were caused by delay, and also for damages on account of alleged misrepresentation on the part of officials of the Government in connection with a construction contract.

Defendant denies liability and files a counterclaim alleging overpayment.

On February 9, 1943, plaintiff entered into a contract with the defendant agreeing to build 1,080 dwelling units near Tooele, Utah, for a consideration of $2,470,000. It was a war housing project to be completed within 160 days after the date fixed in the notice to proceed. The date set in the notice was February 24, 1943, but plaintiff actually began work a few days earlier. Later the contract was amended to provide for the construction of some additional buildings for an added consideration of $190,000.

There were delays in the completion of the work, but extensions of time were granted, the work accepted, and no liquidated damages were assessed.

Prior to the execution of the contract, the President, on October 3, 1942, issued Executive Order 9250, providing, *inter alia*, that except for certain corrective adjustments, no increase or decrease in wages should be authorized until after notice to and approval by the War Labor Board.

On October 23, 1942, on request of the National Housing Agency of the Federal Public Housing Authority (hereinafter called the Housing Authority), the Secretary of Labor made a predetermination of wage rates under the Davis-Bacon Act with respect to this and another housing project to be constructed at Tooele, Utah. These rates had been furnished the Secretary of Labor by the appropriate labor unions.

Invitations for bids, issued on December 10, 1942, contained these specifications as minimum rates and by addendum in January 1943 made them maximum rates of pay as well.

The bids were opened February 1, 1943. At that time the three lowest bidders were requested to submit bids for completion within 90 days instead of 160. Plaintiff was the lowest bidder on the original invitation. It submitted also the bid for the shorter completion period as requested.

Later the Housing Authority decided that it wanted only a part of the dwelling units finished within 90 days. It requested a bid on 340 specified units which it desired finished within 90 days. On February 10, 1943, plaintiff complied with this request offering to complete the 340 specified units within the shorter period for an additional amount of $110,000. This offer was conditioned on acceptance before February 26, 1943, but after an exchange of messages plaintiff agreed to an acceptance a few days later. A change order was issued, which provided among other things, that plaintiff was to assume all additional cost, such as overtime, extra equipment, additional supervision, etc., that might be required to complete that portion of the work within 90 days.

Before submitting its bid for the whole project plaintiff had received bids from proposed subcontractors for doing certain portions of the work. Portions of the work aggregating $721,363 were subcontracted. These subcontracts were executed on February 24, 1943, by plaintiff and the various subcontractors. All of these subcontracts stipulated the time of performance as 90 days from date for 340 units, and 160 days from date for all work. Before executing these contracts plaintiff had been advised of the desire of defendant to have 340 units completed within 90 days' time, but at the time their bids were submitted the subcontractors had not been advised of the pro-

posed change in the time limit of plaintiff's contract.

Prior to submitting its bid plaintiff made inquiry of an official of the bricklayers' union in Salt Lake City as to the availability of bricklayers at $1.50 per hour, and was told that while that was the official union scale no assurance could be given that the project could be properly manned at that rate. The trades council of Salt Lake City on January 27, 1943, had protested to the Secretary of Labor the wage rates set forth in the invitation to bid and had requested the Housing Authority to adopt higher wage rates which it claimed were actually being paid at that time.

Plaintiff ran into many difficulties in endeavoring to secure bricklayers for the project. It requested the bricklayers' union to furnish a supply of labor, but the requested numbers were not supplied by the union officials.

It had been the prevailing custom for laborers who were working on projects removed from urban centers to be paid travel or subsistence allowances, or both, in addition to the hourly rates. One of the subcontractors at first made payments of $2.50 per day for this purpose, but when this became known plaintiff's project manager directed the subcontractor to stop such payments since it was thought by plaintiff that this practice would subject it to penalties. There was considerable delay in connection with the securing of both bricklayers and plumbers. It developed that in the same locality some bricklayers were being paid at a higher rate.

Plaintiff ran into so many difficulties that on March 18, 1943, it requested the Housing Authority to suspend the work until such time as adequate manpower could be furnished pending a possible adjustment in the wage rates. About March 26, 1943, a formal application was made to the Wage Adjustment Board for an increased rate for several trades. On April 23, 1943, the bricklayers' wages were increased by the board from $1.50 per hour to $1.58 per hour, subject to certain conditions set out in finding 10. The plaintiff on May 5, 1943, was advised by the Housing Authority of the authorization of the increased rates.

Plaintiff was well organized and if sufficient labor had been available it could probably have finished the work within the 90-day period for the 340 units and the 160-day limit for the entire project. Plaintiff advertised for labor but was advised that since there was a manpower allocation this course should not be taken. Many of the laborers who were secured were not properly skilled.

Because of the shortage of labor and the delay in the work, certain materials, especially gypsum board which had been timely purchased could not be accepted by plaintiff when ready for delivery because this particular board deteriorates when stored in the open and there was no place in that area for proper storage. When the time came to use gypsum board and certain other materials there was delay in delivery.

Originally plaintiff had planned to start construction on the eastern edge of the project and work westward as this would permit grading from a higher to a lower area, which would facilitate the work generally. However, in view of the selection of the 340 units specified this plan was interrupted to some degree.

At a later date, as set out in finding 15, the Housing Authority determined that the delays were not due to the fault or negligence of the plaintiff, and that the time for the completion of both portions of the contract should be extended so as to bring the completion within the date specified. Accordingly appropriate extensions of time for completion were granted, and no liquidated damages were assessed.

In carrying out the construction program the plaintiff gave preference to the completion of the units specified for the 90-day period, but the extra expense to which it was put in doing so is not definitely shown.

The various items of extra expense which plaintiff uses as the basis of its claims, totaling some $200,000, are set out in findings 16 and 17.

Plaintiff sued on three causes of action, but offered no proof on the second and third causes of action, and finally abandoned those claims. A total of $146,817.52 is the amount claimed in the first cause of action.

█ As to that portion of the claim which deals with the damages caused by insufficient labor, we do not think plaintiff is entitled to recover. It was well known that there was a shortage of manpower throughout the country. There was such a shortage that a manpower agency had been established. It was allocating such labor as was available. The plaintiff as a contractor was familiar with the conditions then existing, had visited the site, which it was required to visit by the terms of the contract, and in the circumstances the defendant could not be held to have warranted a sufficiency of labor. DuBois Construction Corp. v. United States, 98 F.Supp. 590, 120 Ct.Cl. 139.

Plaintiff also complains of the regulations of the War Manpower Commission, but the record shows that the allocations and regulations controlling the use of manpower, as applied to the circumstances in this case, and to the conditions prevailing at the time, were reasonable and necessary.

In the case of Horowitz v. United States, 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736, the Supreme Court quoted with approval the action of the United States Court of Claims in holding that when the Government acts in its sovereign capacity, whether those actions of the Government be legislative or executive, so long as they are public and general, they cannot be deemed to alter, modify or obstruct the contracts into which the Government enters with private persons. The action taken by the defendant in respect to these wage rates were of a general nature, except for the specific adjustments in wage rates, for which there was reimbursement.

This same principle applies to Executive Order 9328, commonly known as the freeze order, and the War Manpower regulations requiring plaintiff and all employers to secure labor through authorized hiring channels. J. B. McCrary Company v. United States, 84 F.Supp. 368, 114 Ct.Cl. 12, 35.

Plaintiff requested that the claim filed January 24, 1944, which is set out in finding 18, be considered as a claim under the War Powers Act of December 18, 1941, 50 U.S.C.A.Appendix, § 601 et seq., and Executive Order 9001, 50 U.S.C.A.Appendix, § 611 note, but this claim was denied by the regional director. Plaintiff appealed to the National Housing Authority from the decision, which also denied the claim.

On September 14, 1944, plaintiff signed a release reserving, however, "Unapproved contractor's claim for additional costs of $181,625.21," this being the amount of the claim set forth in plaintiff's letter of January 24, 1944, and which is summarized in finding 17.

After the wage rates were increased the plaintiff was reimbursed for the amount expended under the actual increase in hourly rates so that this phase of the claim for expenditures has been settled.

█ Defendant asks for judgment on its counterclaim in the sum of $110,000, on the ground that for said payment there was no consideration. It places particular emphasis on the fact that plaintiff did not increase the payments to the subcontractors over what they had originally bid.

The plain provisions of the supplemental contract called for this payment as an inducement to finishing 340 units within a period of 90 days. The entire contract was completed within the contract time as extended and the 340 units were completed in advance of the other parts of the contract. After an investigation the contracting officer and the Housing Authority found that, considering delays for which plaintiff was in no way responsible, appropriate extensions should be granted, that these extensions should apply to the 90-day provision as well as other phases of the contract, and that when extensions were granted, both phases of the contract had been completed within the time specified. No liquidated damages were assessed, and plaintiff was paid the $110,000 which it had been promised for an earlier completion of the 340 units.

It is true that the subcontractors' bids were submitted before plaintiff's bid was made, but they were accepted after plaintiff had submitted its bid for earlier completion of a portion of the units. Plaintiff

made a sincere effort to and did complete them earlier than the other units were completed. In doing so it rearranged its plan of work. It ran into many difficulties on the entire project. It had extra expense in transporting labor to the site of the work. It incurred expense in providing expediters to hasten delivery of materials. It incurred expense for overtime both in the 90-day as well as in the other area. Its overtime expense was $81,738.91 on all work done. It incurred other extra items of expense as set out in finding 21. There was extra expense due to the shortage of skilled labor.

This has been a most difficult case to properly appraise. The testimony is conflicting. Many of the troubles were due to conditions for which neither party was to blame. There is no doubt plaintiff was put to considerable expense, but most of this grew out of the labor and material shortage closely linked to wartime conditions and to essential general sovereign orders issued in connection with the waging of an all-out war.

The defendant temporarily withheld payment of the extra $110,000, but later paid it. There seemed at first to be some question as to whether the 340 units had been completed within the 90 days as extended, but this question was finally resolved in plaintiff's favor and the extra amount was paid. It is difficult to escape the conclusion that this action may have been partially a concession made because of the extra trouble and expense to which plaintiff had been subjected.

In the confused state of the record we are inclined to leave the parties where we find them, especially since the defendant's authorized officers, after consideration, paid plaintiff the sums stipulated in both the original and the supplemental contracts.

On the counterclaim the plaintiff takes the position that since disputed questions of fact were to be determined by the contracting officer, and since that officer had made a decision favorable to the plaintiff, that decision is final and conclusive under the principles laid down in the case of United States v. Wunderlich, 342 U.S. 98, 72 S. Ct. 154. In view of our disposition of the case on other grounds it is not necessary to pass on that question.

The plaintiff's petition and the defendant's counterclaim are dismissed.

HOWELL, MADDEN, WHITAKER, and LITTLETON, Judges, concur.