**SHEDD–BARTUSH FOODS OF ILLINOIS, Inc., an Illinois corporation,**

v.

**COMMODITY CREDIT CORPORATION, a Federal corporation.**

No. 48 C 1725.

United States District Court
N. D. Illinois.

July 18, 1955.

Smith & Huffaker, Detroit, Mich., Musgrave, Ewins, Hanson & Anderson, Chicago, Ill., for plaintiff.

Robert Tieken, Chicago, Ill., for defendant.

HOFFMAN, District Judge.

Shedd-Bartush Foods of Illinois, Inc., brought this suit against the Commodity Credit Corporation to recover approximately $65,000, allegedly owed as the result of a contract whereby the plaintiff agreed to, and did, sell 500,000 pounds of oleomargarine to the defendant. The recovery of this amount is sought either as the unpaid balance of the purchase price, or as damages for

breach of contract, or as restitution of unjust enrichment. Federal jurisdiction is based on 15 U.S.C.A. § 714b(c) which provides that the district courts of the United States shall have exclusive jurisdiction of all suits brought by or against the Commodity Credit Corporation. The United States owns all of the capital stock of the Commodity Credit Corporation.

The contract here involved consisted of an offer by the plaintiff sent to the Commodity Credit Corporation by day letter on September 25, 1946, reading as follows:

"We Are In Position To Make Additional Half Million Pound Coconut Oil Margarine Late November Delivery At Same Price As Per Contract, Namely $16.53 CWT. FOB Elgin Stop Please Consider This As Firm Offer And Advise If Acceptable."

The Commodity Credit Corporation accepted the offer by a night letter filed September 25, 1946, reading as follows:

"Reurtel September 25, 1946, Your Contract AW–F(F)–42190 Is Hereby Amended To Accept An Additional 500,000 Pounds Of Coconut Oil Margarine, November Delivery. All Other Terms And Conditions Of The Contract Remain Unchanged. Wire Weekly Delivery Schedule."

The contract AW–f(F)–42190, mentioned in the telegram of acceptance above quoted, was effectuated by a counter offer made by telegram from the Commodity Credit Corporation to the plaintiff on September 11, 1946, and the telegraphic acceptance thereof by the plaintiff on September 13, 1946. Resolution of the conflicting claims of the parties as to the terms of this contract requires consideration of the public announcement by which the Commodity Credit Corporation solicited bids for the sale to it of oleomargarine and the ensuing correspondence between the parties.

The solicitation of bids was made by Announcement FO–22, dated August 13, 1946, which began with the following statement:

"In order to meet definite supply needs, the U. S. Department of Agriculture (USDA) hereby announces contemplated purchases by the Commodity Credit Corporation (hereinafter referred to as CCC) of 15,-000,000 pounds of Oleomargarine, colored (Special) made from coconut oil for export. CCC will arrange to provide a source of supply of crude coconut oil at ceiling price in the event that the successful bidder (or bidders) are not in a position to procure crude coconut oil thru usual channels. * * *

"Offers must be submitted on prescribed Form FOO–22 * * *"

On August 30, 1946, the plaintiff submitted a bid on Form FOO–22 to sell to the Commodity Credit Corporation 500,-000 pounds of oleomargarine to be delivered bi-weekly in October and 500,000 pounds to be delivered bi-weekly in November at 16.53 cents per pound. The bid was transmitted by a covering letter of the same date in which plaintiff explained the basis upon which it had reached the figure of 16.53 cents per pound as the bid price. The material portions of this letter read as follows:

"With reference to the attached bid for one million pounds of coconut oil Margarine, F.O.–22, in offering this bid of $16.53 per cwt., it was necessary that we take into consideration a number of possibilities.

"First, we have been advised by our oil refiners that they anticipate a one-half cent advance in the present price of coconut oil. The price in effect as of today is $13.89 per cwt., and if this one-half cent is put on, our cost will be $14.39 on the oil alone. At present, our main supplier, namely, Procter & Gamble Company, reserves the right to put this one-half cent escalator clause on any orders we place, however, we

are of the opinion if we are advised that the oil takes this additional one-half cent, this will be a firm price, namely, $14.39.

"Second, our supplier of shipping containers also advised us that they will not guarantee the present price on containers as they have not advanced their price on this type of board for a number of years and they feel they are entitled to an increase, particularly in view of their competitors having already taken an increase of from 10 to 15 per cent. If this increase goes into effect on the cases, it would amount to about another 7 cents per cwt. on the finished product.

"Third, our Vitamin A suppliers have at present with-drawn from the market and will no longer supply an ester and alcohol type Vitamin A at today's prices. They will, however, make shipment of acetone base Vitamin A, which will cost us 35% more than the type we are now using.

\*   \*   \*   \*   \*   \*

"Summing this up, we are bidding $16.53 per cwt. on a million pounds of coconut margarine for delivery in October and November   \*   \*   \*

"If it meets with your approval, we could consider another one-half million for delivery later on."

The statement in the above letter that the plaintiff anticipated its cost on coconut oil would be 14.39 cents per pound is misleading. There was an excise tax on coconut oil payable by the refiner of 3 cents per pound. Since the Government waived this excise on all oil sold for use in the performance of government contracts, the cost to plaintiff would always be 3 cents less than market or ceiling prices, in this instance 11.39 cents instead of 14.39 cents. Throughout plaintiff's correspondence with the defendant and in its calculation of damages here the plaintiff uses market prices as its cost, rather than three cents less than

market, which would have been the true cost to plaintiff.

Before receiving any reply to the above bid the plaintiff, under date of September 10, 1946, sent the Commodity Credit Corporation the following telegram:

"Reference Our Recent Bid Announcement FO–22 This Should Read $16.53 As Firm Bid Based On Present Oil Market Stop Would Appreciate Advise As Promptly As Possible On This As Necessary We Make Arrangements For Tins And Cases"

The defendant replied by telegram dated September 11, 1946, reading as follows:

"Subject Terms And Conditions FO–22 CCC Accepts Your Offer Dated August 30, 1946, As Amended By Telegram Of September 10, For 1,000,000 Pounds Of Coconut Oil Margarine At $0.1653 Per Pound FOB Elgin, Illinois. Delivery 250,-000 Pounds Each Two Week Period Ending October 15, October 31, November 15 And November 30, 1946. Your Contract Number AW–f(F)–42190. Confirm By Wire."

The plaintiff accepted the foregoing counter-offer by telegram dated September 13, 1946, reading as follows:

"Retel September 11th Confirm Contract AWF–F 42190 For One Million Pounds Margarine At .1653 Per Pound FOB Elgin Illinois"

The foregoing counter-offer and acceptance accordingly constituted the contract to which the parties had reference when they exchanged the telegrams of September 25, 1946, above quoted, by which it was agreed that the plaintiff would sell the defendant an additional 500,000 pounds of oleomargarine at 16.-53 cents per pound for late November delivery, all other terms and conditions remaining the same as in the previous contract. The defendant's telegram of September 25, 1946, had requested that plaintiff "Wire weekly delivery schedule."

The defendant not having received the requested delivery schedule sent the plaintiff a day letter on October 2, 1946, reading as follows:

"Please Wire Delivery Dates Requested Our Amending Telegram Of September 25th. Urgent."

The plaintiff replied by telegram of the same date reading as follows:

"Answering Just Received Confirmation On Oil Shipment For Balance Of This Contract Stop Will Make Delivery This Additional 500,000 Pounds Our Contract AW–F(F)–42190 Week Of November 25"

The record contains no explanation for the above telegram. The statement by the plaintiff therein that it had "received confirmation on oil shipment for balance of this contract" was apparently false. At least, the plaintiff's entire case here rests upon its claim that it was unable to secure coconut oil at a fixed price at any time prior to the lifting of OPA ceiling on prices of coconut oil on October 30, 1946, that after the lifting of the ceiling the prices doubled and that plaintiff did not purchase the coconut oil needed for this contract until March 11, 1947, when the defendant insisted it must deliver by April 30, 1947, or be responsible for its failure to perform. Beginning on November 11, 1946, and continuing until March 17, 1947, the plaintiff wrote the defendant numerous letters complaining of its inability to purchase coconut oil except at such high prices as would cause it a huge loss if it were to sell the oleomargarine to the defendant at the price fixed in the contract. In these letters the plaintiff sought either a cancellation of the contract or extension of the date for performance until such time as the plaintiff could perform without suffering a loss. Illustrative is the plaintiff's letter to the defendant dated November 11, 1946, and reading in material part as follows:

"We find ourselves in difficulties insofar as additional 500,000 pounds of coconut oil margarine, scheduled for November delivery, is concerned.

"We are referring to our exchange of telegrams of September 25, in which we offered to produce and sell an additional half-million pounds on our contract AW–F(f)–42190, at the same price, namely, $16.53, f. o. b. Elgin. On the same day we submitted this offer, we had been quoted by a refiner, coconut oil at .1409, which is the same price we had on the original million pounds which we are now finishing up. This refiner did not confirm this quotation until September 30, and they then put in an escalator clause which gave them the privilege of advancing the price as they make shipments of oil. * * *

"We immediately contacted other refiners, but due to commitments already made and strike conditions, it was impossible to get any oil confirmed at any price for any special delivery date. * * *

"The market today, on coconut oil is .25. In view of this, we would appreciate your indulgence in either cancelling this part of the contract, or holding it in abeyance until we are assured of a cost on oil which will permit us to manufacture it at a profit."

The record does not reveal what reply, if any, defendant made to the foregoing letter. However, it is clear from subsequent correspondence that defendant did not press for delivery until early 1947. It finally threatened to terminate the plaintiff's right to perform unless delivery was made prior to April 30, 1947. The plaintiff did deliver by that date and collected the agreed upon price of 16.53 cents per pound.

In order to meet the delivery date of April 30, 1947, the plaintiff purchased the requisite amount of coconut oil on March 11, 1947 at the market price of 30 cents per pound, or 27 cents cost per pound to plaintiff after allowance for the 3 cents excise tax which it was allowed to deduct from market price. The manufacture of 500,000 pounds of margarine required approximately 410,000 pounds

of coconut oil. The total cost of the coconut oil was therefore approximately $110,000. With the total contract price for the 500,000 pounds of margarine at 16.53 cents per pound only $82,650, this produced a loss to the plaintiff of approximately $28,000 without allowance for direct labor, tins and cartons, or overhead.

In the amended complaint recovery for the sum of $65,231 is sought. The plaintiff did not offer any evidence to establish the amount of its loss, other than to introduce the contract of March 11, 1947 for the purchase of the requisite oil at 30 cents per pound.

■ As its first ground for seeking recovery, the plaintiff argues that the selling price in the contract was actually not an unconditional price but was subject to adjustment in the event of an increase in the price of coconut oil. Accordingly, the recovery of $65,000 is sought as the amount of the purchase price remaining unpaid. The construction of the contract as providing for a price adjusted to increases in the cost of production is predicated upon the language used by plaintiff in its telegram of September 10, 1946 in which it stated its recent bid "should read $16.53 as firm bid based on present oil market." The contract here sued on however was entered into on September 25, 1946. The exchange of telegrams of that date specified a definite price of $16.53 per cwt. The language of these telegrams is not susceptible of a construction that an adjustable price was contemplated.

These telegrams incorporated by reference "all other terms and conditions" of the prior contract to deliver 1,000,000 pounds of oleomargarine in October and November. The specification of price and delivery date in the telegrams of September 25, makes it plain that the parties did not mean to incorporate by reference the price and delivery dates. Rather the use of the word "other" indicates that only terms and conditions other than price and delivery date were incorporated by reference.

But even if the price set for the 1,000,-000 pounds was incorporated by reference, no different result follows. The contract for the 1,000,000 pounds was also at a definite price of 16.53 cents per pound. The Commodity Credit Corporation did not accept plaintiff's telegram of September 10, 1946 stating that its bid of August 30 "should read $16.53 as firm bid based on present oil market." Whatever plaintiff may have meant by this language, instead of accepting this offer, the defendant made a counter offer which fixed a definite price and eliminated all reference to a price "based on present oil market." The defendant's telegraphic reply of September 10, 1946 by specifically stating the price was to be $0.1653 per pound and asking the plaintiff to confirm by wire, was not an acceptance of plaintiff's offer. The plaintiff's telegram of September 13, 1946 replying specifically to the defendant's telegram of September 11, constituted the acceptance which completed the contract. This reply also recited the price as an unconditional "$.1653 per pound." Thus there was a meeting of the minds on a fixed price of $0.1653 per pound. The defendant's counter offer evidenced a desire to eliminate any ambiguity arising from the description of the price as based on present market conditions. The plaintiff acquiesced in the elimination of those words by its acceptance in terms of a definite unqualified price per pound.

■ Moreover, the words "based on present market price," which followed the price set out in the September 10 telegram sent by plaintiff to defendant, cannot fairly be read as rendering the price adjustable to the fluctuations in the price of coconut oil. There was no escalator provision provided. Nothing in the offer suggested the basis of the allegedly intended price adjustment. In view of the plaintiff's letter of August 30, 1946, transmitting the form papers containing the bid, the words must be taken to have reference solely to the basis on which the plaintiff figured the bid. The plaintiff in that letter felt impelled

to explain that its price of 16.53 cents per pound was based on its estimate as to the probable increases in costs of coconut oil, containers and Vitamin A which would affect its cost of production. The very fact that the plaintiff had arrived at the figure of 16.53 cents per pound by calculating expected increases in costs negatives any implication that the plaintiff intended the price to be adjusted to increases in costs.

Likewise, in the correspondence ensuing between the parties when the plaintiff found itself faced with a loss due to increased costs, plaintiff repeatedly assumed the contract was for a fixed price. The plaintiff in its letter of November 11, 1946, to defendant asked that the contract either be cancelled or the date of delivery postponed, because if delivery was required under the contract terms its loss would be "terrific." If the plaintiff considered that the contract was open to the construction for which it now contends, the plaintiff would have had no concern about a loss.

In view of the foregoing, there is no basis for construing the contract for the sale and purchase of the additional 500,000 pounds of oleomargarine as fixing a price adjustable to save plaintiff harmless from increases in the cost of coconut oil. Rather the contract was for a fixed price of 16.53 cents per pound of oleomargarine. The full price agreed upon having been paid, no unpaid balance remains due.

■ The second ground upon which the plaintiff relies is that the defendant breached the contract by rejecting a bid which plaintiff sent to the Commodity Credit Corporation on November 27, 1946 offering to buy 10 tank cars of crude coconut oil at 8½ cents per pound. As appears from the language above quoted from Announcement FO–22 of the Commodity Credit Corporation, dated August 13, 1946, in soliciting bids for oleomargarine, the Commodity Credit Corporation represented that "CCC will arrange to provide a source of supply of crude coconut oil at ceiling price in the event that the successful bidder (or bidders)

are not in a position to procure crude coconut oil thru usual channels." The plaintiff insists that this sentence in the announcement was one of the terms and conditions of each contract between it and the defendant entered into pursuant to bids submitted in response to this announcement. The contract for the million pounds of oleomargarine effectuated by the telegrams of September 11 and 13, 1946 and the contract for the half million pounds effectuated by the telegrams of September 25, 1946 were both subject to the terms and conditions of the announcement. Indeed the counter offer of the defendant dated September 11, 1946, which was accepted by plaintiff on September 13, 1946, began with the words: "Subject terms and conditions FO–22."

The defendant contends that "terms and conditions FO–22" referred solely to those provisions of the announcement appearing under the heading "Terms and Conditions" therein. No provision with respect to the procuring of coconut oil by the Commodity Credit Corporation for bidders appears under the heading "Terms and Conditions." The only reference to it is the above quoted sentence which appears as the second sentence in the first paragraph of the announcement. The first and subsequent paragraphs preceding the heading "Terms and Conditions" contained introductory and explanatory information as to where and how bids were to be submitted.

Whether the assurance in the solicitation for bids that the Commodity Credit Corporation would procure crude coconut oil for any bidder who could not secure such oil thru usual channels became a part of the contract or not, need not here be decided. The plaintiff has completely failed to show any breach of this assurance. The plaintiff never requested the Commodity Credit Corporation to arrange to provide a source of crude oil for the purpose of enabling plaintiff to fulfill its contract. Although the plaintiff repeatedly complained to the Commodity Credit Corporation of its inability to procure coconut oil at a

price low enough to prevent a loss, all of its complaints were directed to securing either a cancellation of or postponed delivery date for its obligation to sell the additional 500,000 pounds of oleomargarine. Nowhere in any letter or telegram having reference to these contracts did plaintiff ever assert that it could not secure coconut oil through the usual channels or ever request that the defendant provide it with a source of supply of coconut oil. No testimony was offered in support of any contention that plaintiff either was unable to procure coconut oil through the usual channels or that plaintiff had called upon the Commodity Credit Corporation to assist the plaintiff in procuring the coconut oil needed for the manufacture of the oleomargarine under these contracts.

The plaintiff, in order to show a breach of the assurance that a source of supply would be provided if usual channels were inadequate, offered in evidence a telegram from the plaintiff to the Commodity Credit Corporation, dated November 27, 1946, and the telegram of reply thereto, dated December 4, 1946. The plaintiff's telegram to the Commodity Credit Corporation, dated November 27, 1946, made no reference directly or indirectly to any of its contracts with the Commodity Credit Corporation. This telegram read in full as follows:

"Reference Your Announcement FO–24, We Offer Bid 8½ Cents Per Pound For 10 Tank Cars Crude Coconut Oil F. O. B. Oakland Or Long Beach, California, Immediate Delivery."

The telegram from the Commodity Credit Corporation, dated December 4, 1946, rejecting this bid, likewise contained no reference direct or indirect to any of the contracts between the plaintiff and the defendant. The material portion of this telegram reads as follows:

"Reurtel Submitting Bid For Purchase Of Coconut Oil. Bids For Less Than 18.64 Cents Per Pound Basis Announcement FO–24 Cannot Be Accepted. Suggested You Submit New Bid Subject To Terms And Conditions Of Announcement FO–24 * * * "

The plaintiff's bid on November 27, 1946, for 10 tank cars of crude oil was not susceptible on its face of being construed as a request for the oil necessary for the margarine contract. Not only the absence of any reference to the margarine contract, but the number of tank cars requested was such that plaintiff had no reason to assume that the Commodity Credit Corporation would relate the telegram to the margarine contract. Ten tank cars of crude coconut oil contain 600,000 pounds of crude coconut oil whereas the manufacture of 500,000 pounds of oleomargarine would require only 425,000 pounds of crude oil. Its bid was thus for approximately 175,000 pounds in excess of the amount required for the margarine contract.

The price bid by plaintiff was so low that the plaintiff could have no possible basis for complaining of the rejection of its bid. The plaintiff's bid of 8½ cents per pound of crude coconut oil was 10 cents below the then market price of 18.64 cents per pound.

In sum, plaintiff has completely failed to establish any breach by the defendant of an obligation to provide a source of supply of crude coconut oil even if the defendant ever assumed such an obligation.

The third ground for recovery alleged by the plaintiff likewise rests on an asserted breach of contract by defendant. The plaintiff argues that the defendant as a branch of the United States Government is responsible for acts of other branches of the government, to wit, the Office of Price Administration. The argument is that the lifting of ceilings on the price of coconut oil by the Office of Price Administration and thereby increasing the plaintiff's costs was a breach of defendant's implied promise that it would do no act which would increase the cost of performance by the plaintiff. The plaintiff asserts that "Every contract carries the implied condition that neither party will so act as to increase the cost of performance by the other,"

and that this implied condition is as applicable to the government when it is a party to a contract as to private parties.

■ The law is well established that the United States, as a contractor, cannot be held liable for an obstruction or interference with performance of a particular contract, to which it or a government agency may be a party, when such obstruction or interference results from its public and general acts as a sovereign.

The leading case is Horowitz v. United States, 1925, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736. That was an action brought by Horowitz to recover damages for the alleged breach of a contract relating to the purchase of silk from the Ordnance Department. Horowitz suffered a substantial loss on the silk because of a two weeks' delay of the Ordnance Department in shipping the silk to him promptly when he notified them to make delivery. The delay was occasioned by a temporary embargo upon the shipment of silk by freight which had been imposed by one of the agencies of the United States Government, namely, the United States Railroad Administration. In denying recovery the Supreme Court stated, 267 U.S. at page 461, 45 S. Ct. at page 344:

"It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign. Deming v. United States, 1 Ct.Cl. 190, 191; Jones v. United States, 1 Ct.Cl. 383, 384; Wilson v. United States, 11 Ct. Cl. 513, 520. In the Jones Case, supra, the court said: 'The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public

and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons. * * * In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants.' " ·

The Horowitz case has been consistently followed in numerous cases. In two recent cases the action of government price stabilization authorities in changing the ceilings on prices had caused losses to parties to contracts with the government. In Piggly-Wiggly Corp. v. United States, 1949, 81 F.Supp. 819, 112 Ct.Cl. 391, the plaintiff had contracted with the Quartermaster Corps, War Department, to furnish 50,000 plywood lockers at the price of $4.60 each. The plaintiff had based his price on then existing ceilings on prices. Due to a raising of the ceilings plaintiff suffered a substantial loss. As here, the argument was that the contract contemplated an adjustment in price if costs were increased, and if not, the government was liable for the loss occasioned by its conduct in increasing the cost of performance. Both claims were rejected. The terms of the contract were held to have been fixed by the government's counter offer, which, as here, set a definite price and omitted any reference to fluctuations in market prices. With respect to the effect of the action of the Office of Price Administration in raising the ceiling on prices the court said, 81 F.Supp. at pages 822–823:

"The government's defense to this claim is based on the theory that the act of the Office of Price Administration alleged to have harmed plaintiff, was an act of the Government in its sovereign capacity and not in its capacity as a contractor.

Defendant refers us to Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834, as authority for the fact that a change in ceiling prices by OPA is a sovereign act of the United States, and to Horowitz v. United States, 267 U.S. 458, 45 S.Ct. 344, 69 L.Ed. 736, for the proposition that the Government cannot be liable in its contractual capacity for its sovereign act.

"We think the Government's defense is valid. The Emergency Price Control Act of 1942, 50 U.S.-C.A.Appendix, § 901 et seq., providing for the establishment of the Office of Price Administration, and the control of prices, was a law of general application. It is undoubtedly true that many persons having contracts both with the Government and with other private persons, suffered through its application unless their contracts expressly provided for adjustments in the contract price when costs were increased by changes in price ceilings. In Clemmer Construction Company, Inc., v. United States, 71 F.Supp. 917, 108 Ct. Cl. 718, this court held that the action of the War Manpower Commission in specifying the area in which plaintiff was performing its contract as one in which the forty-eight hour week should be worked, was a sovereign act, and that plaintiff could not recover its increased costs incurred through compliance with the order. As pointed out by defendant, United States v. Barlow, 184 U.S. 123, 22 S.Ct. 468, 46 L.Ed. 463; Clark v. United States, 6 Wall. 543, 73 U.S. 543, 18 L.Ed. 916, and George A. Fuller v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70, are inapplicable since in those cases the Government interfered with the contractor's operations in its capacity as a contractor, not as a sovereign.

"Accordingly we must conclude that plaintiff is not entitled to recover on this claim."

In Theobald Industries v. United States, 1953, 115 F.Supp. 699, 126 Ct. Cl. 517, certiorari denied 347 U.S. 951, 74 S.Ct. 676, 98 L.Ed. 1097, the plaintiff was engaged in the manufacture of fancy tallow. It contracted to purchase all the fat, grease and bones from designated army camps and installations until June 30, 1952 at a fixed price per designated type of waste material. At the time plaintiff made the contract the ceiling price on fancy tallow was 15½ cents per pound. On January 8, 1952, the price stabilization authorities lowered the ceiling to 10½ cents per pound. As a result the plaintiff suffered a loss of $44,793 on its contract with the government. The plaintiff submitted his claim for a modification of his contract to relieve him of the losses to the Army Contract Adjustment Board. The latter denied the claim because "in establishing ceilings the defendant was acting in its sovereign capacity". 115 F.Supp. at page 700. The court found no basis for disturbing this ruling.

In Barnes v. United States, 1952, 105 F.Supp. 817, 820, 123 Ct.Cl. 101, the plaintiff contracted to build war housing for the government for a fixed price. As the result of government orders allocating material and labor, plaintiff was put to unanticipated expense in fulfilling the contract. The court denied recovery for the excess costs, holding that they were due to sovereign acts of the government. The Horowitz case was cited as authority.

In Geo. H. Evans & Co. v. United States, D.C.E.D.Pa., 1947, 74 F.Supp. 58, affirmed, 3 Cir., 169 F.2d 500, the plaintiff contracted to construct emergency housing for the government. Regulations issued by the government prescribing the plumbing facilities for government constructed housing were inconsistent with local regulations. The local authorities enjoined the government and the plaintiff from building according to government regulations. The government insisted that plaintiff continue with all of the construction without awaiting

the results of the injunction suit. Accordingly, the plaintiff suffered a substantial loss by constructing the housing without plumbing and later installing the plumbing. In denying recovery the court relied upon the Horowitz case.

In Hales v. United States, D.C.W.D. Okl.1953, 113 F.Supp. 505, in reliance on the Horowitz case the court denied the plaintiff recovery for losses sustained when the government terminated its contract for the training of army flyers. The plaintiff showed substantial expenditures in buying and equipping an air field to meet government regulations.

■ None of the cases cited by the plaintiff would justify holding the Commodity Credit Corporation liable for losses of the plaintiff arising from the lifting by OPA of ceilings on prices on coconut oil. All of the cases cited by the plaintiff involved losses resulting from conduct of the government in its capacity as a contractor and not general acts as a sovereign. Of course, if the acts of the government taken in relation to the contract as such cause a loss, it is subject to the same liability as any private contracting party in the same situation. This was the test applied by the courts in all the cases cited by plaintiff. It places its main reliance upon Beuttas v. United States, Ct.Cl., 1944, 60 F.Supp. 771, 779, but this decision was reversed by the Supreme Court. United States v. Beuttas, 1945, 324 U.S. 768, 65 S.Ct. 1000, 89 L.Ed. 1354. The plaintiff there had contracted to construct the foundations for a housing project. The contract fixed minimum wages to be paid to the contractor's workmen with a provision that the government might raise the wage rate in which event the contract should be adjusted accordingly. The government did not raise the wage rate applicable to this contract, but did invite bids for the superstructure at minimum wages higher than those fixed in the contract with the plaintiff for the foundations. As a result of the inviting of bids at higher wage rates, the plaintiff's employees refused to work at the lower rates although they were governed by collective bargaining contracts not terminable prior to the completion of the project, which collective bargaining contracts specified the same rate as the plaintiff's contract with the government. The government's invitation of bids for the superstructure had reference to work to be performed after the foundations were completed, and hence did not contemplate a situation in which work performed at the same time would be paid at different minimum rates. In holding that the government was not liable to plaintiff for the increased costs, the Supreme Court based its decision on the absence of any showing that the government should have anticipated the breach of existing wage agreements and on the fact that the government took no part in the settlement of the wage controversy.

In Virginia Engineering Co. v. United States, 1944, 89 Ct.Cl. 457, the recovery was allowed under a special Act of Congress providing that just compensation should be awarded for extra expenses incurred as a result of the intervention and insistence of the Director under whose orders the contract was being performed.

In York Engineering & Construction Co. v. United States, 1945, 62 F.Supp. 546, 103 Ct.Cl. 613, the contract provided that the minimum wage rates set in the contract were subject to change by the contracting officer, and that the contract price should be adjusted to compensate for any change to be made. Under this provision, it was held that the contractor could recover for such increases in wages as were due to the action of the government in increasing wages in similar contracts in the area.

In Gerhardt F. Meyne Co. v. United States, 1948, 76 F.Supp. 811, 110 Ct.Cl. 527, the contract had obligated the Government to permit the contractor to use certain roads to gain access to the property. Recovery was allowed for the additional expenses incurred as a result of the closing of the roads on the ground that it was an implied promise that if the roads were not available, for whatever reason, whether a sovereign act or

otherwise, the government would pay the increased costs.

In Edmund J. Rappoli Co. v. United States, 1943, 98 Ct.Cl. 499, the contractor made an obvious error in calculation on his bid, which was discovered before the contract was executed. The contracting officer assured the contractor that the price would be adjusted to correct the mistake if the contractor would continue with ·the performance of the contract. The ·court held that this promise of the contracting officer was binding on the government.

■ In the present case, no conduct of the defendant as a contracting party increased the costs of the plaintiff. No promise was given the plaintiff by any officer of the government that ceiling prices would not be increased or removed, or that plaintiff would be reimbursed for any additional costs, if ceilings on coconut oil were increased or removed. ·

■ The plaintiff does not make any contention that it would be entitled to recover because of the ' lifting of the OPA ceilings if the .Commodity Credit Corporation were a private corporation rather than an agency of the United States Government. The usual rule, of course, is that sellers must bear the risk of increases in prices unless they contract for protection therefrom. In Pacific Trading Co. v. Mouton Rice Milling Co., 8 Cir., 1950, 184 F.2d 141, 149, the applicable law was stated as follows:

"A contract to sell a commodity for future delivery is not frustrated by a change in the price of the commodity before the time for delivery arrives. The fluctuation in market prices is within the contemplation of the parties to every contract to sell for future delivery, and the risk of loss attendant upon it is assumed by the buyer and seller alike in the absence of an explicit provision against it in the contract."

■ It is true that "where a very great increase in expense is caused by a circumstance not only unanticipated but inconsistent ·with facts which the parties obviously assumed as likely to continue" (Williston on Contracts, Rev. ed., 1938, vol. 6, pp. 5508–5509, sec. 1963), performance may be excused. In the instant case, however, the record shows that the plaintiff had every reason to anticipate the lifting of ceilings. The plaintiff itself introduced as an exhibit a letter dated August 23, 1946 written by it to Mr. W. J. Dormer, the same officer of the defendant with whom it dealt in making the oleomargarine contracts. This letter referred to a previous contract between plaintiff and defendant and is relevant here only for the purpose of establishing that at the time of the oleomargarine contracts, entered into· more than a month later, the plaintiff must have anticipated the removal of price ceilings on coconut oil as a real possibility. The letter begins as follows:

"Our bid on the above contract was offered at the time raw· materials were on ceiling prices. We, of course, established our offering price at these ceilings. A portion of our contract was manufactured from materials which we had contracted for and purchased prior to the decontrol of raw materials going into the product. A larger portion, however, was manufactured from oils and other ingredients that were purchased during the decontrol period, and we, of course, had to pay substantial increases on these items * * *

" * * * It goes without saying, that we will be suffering a heavy loss on this contract unless an adjustment is made."

■ In view of the above quoted letter, it appears that the plaintiff deliberately took the gamble on price changes due to the lifting of OPA ceilings when it entered into the contract of September 25, 1946 to sell 500,000 pounds of oleomargarine to the government at a fixed price. There are available devices, by inclusion of escalator clauses or cost-plus-fixed-fee provisions, to enable a con-

tractor to shift to the government risks inherent in price changes. In view of the plaintiff's prior experience with the removal of ceilings, it can only be inferred that the plaintiff made the bid and entered into the contract of September 25, 1946, with full assumption by it of the risks of price increases resulting from the lifting of OPA ceilings.

The fourth ground upon which the plaintiff bases this suit is that the defendant resold the oleomargarine at a profit of approximately $65,000. The plaintiff claims that the government was thus unjustly enriched at the expense of the plaintiff and hence that the plaintiff is entitled to restitution. But in the absence of a rescission of the contract, a seller can never recover the profit made by the buyer over and above the price at which the seller contracted to deliver the goods. The existence of an express agreement between the parties precludes the existence of any implied promise. The applicable rule is set forth in the Restatement on Restitution, Sec. 107, pp. 447–448, as follows:

"Effect of Existence of Bargain Upon Right to Restitution

"(1) A person of full capacity who, pursuant to a contract with another, has performed services or transferred property to the other or otherwise has conferred a benefit upon him, is not entitled to compensation therefor other than in accordance with the terms of such bargain, unless the transaction is rescinded for fraud, mistake, duress, undue influence or illegality, or unless the other has failed to perform his part of the bargain.

"(2) * * * * * * * *

"Comment on Subsection (1) * * * a person is not entitled to compensation on the ground of unjust enrichment if he received from the other that which it was

agreed between them the other should give in return."

None of the four grounds upon which the plaintiff seeks recovery sustains its position. There remains, however, for the court to inform the parties of its rulings on certain objections to the evidence so that the state of the record may be clear. All of the exhibits offered by the parties are received. While the depositions which the plaintiff took of its own officers are largely conclusionary, self-serving and hearsay, since the court is hearing the case without a jury their admission can do no harm. Accordingly, the depositions have been considered and given such weight as the nature of the testimony adduced warranted. Plaintiff's exhibits 2, 7 and 8 relate to contracts other than those for oleomargarine here involved. Plaintiff's exhibit 2 is the letter of August 23, 1946 to defendant's employee Dormer, quoted above. Even though the letter pertained to another contract, it showed plaintiff's experience with the lifting of price ceilings during the months immediately preceding the contract here involved. As such it is relevant. Plaintiff's exhibits 7 and 8 are respectively the bid to buy crude oil from the defendant at 8½ cents per pound and defendant's rejection of the bid. They provide the proof for the plaintiff's second ground for recovery. As such they are relevant and must be admitted although they fail to establish the contention for which they were introduced.

There will be a finding of the issues in favor of the defendant and against the plaintiff. The findings of fact and conclusions of law hereinabove set forth will be considered the findings of fact and conclusions of law required under Rule 52(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A.

Judgment will accordingly be entered for the defendant with costs assessed against the plaintiff.