**W. O. DILLON, Sr., W. O. Dillon, Jr., and Virginia P. Dillon, A Partnership Doing Business as Vinita Hay Company,**

v.

**UNITED STATES.**

**No. 199–55.**

United States Court of Claims.
Dec. 4, 1957.

George H. Jennings, Sapulpa, Okl., for plaintiffs. Paul A. Walker, Oklahoma City, Okl., was on the brief.

Francis P. Borden, Jr., with whom was Asst. Atty. Gen. George Cochran Doub, for defendant.

JONES, Chief Judge.

This is an action in which plaintiffs sue for excess costs of hay delivered to defendant in Oklahoma under a supply contract. It is pleaded that such excess costs were due to the severe drought conditions which prevailed in that area during the period of performance.

The plaintiffs, a partnership doing business as Vinita Hay Company, at Vinita, Oklahoma, on April 29, 1952, entered into a contract to furnish to the defendant certain amounts of hay as set out in findings 2 and 3. The hay was to be delivered during the months of July, August and September 1952. The price was $26 per ton. The hay was to be delivered at the Reno Quartermaster Remount Station, Fort Reno, Oklahoma. The contracting officer was R. H. Richards, Fort Worth Quartermaster Depot, Fort Worth, Texas. The delivery price of the modified contract was $49,915.82.

The area comprising 5 or 6 counties in northeastern Oklahoma within a radius of 50 miles from the city of Vinita is recognized as a principal prairie hay-producing area within the State of Oklahoma. The type of hay to be used in filling this contract matures largely during the month of June and cutting usually begins in late June or early July.

In the year 1952 an unusually severe drought prevailed not only in Oklahoma but in some of the surrounding States during the month of June. On account of the dry, hot and searing weather the yields of prairie hay were very short in the State of Oklahoma. The weather was so severe that the State of Oklahoma was included among the States where the drought was of sufficient severity and magnitude to warrant assistance by the Federal Government. By declaration, the President made available emergency funds to be used "in meeting any unrecoverable portion of the costs of procuring, transporting and distributing certain livestock feed in order to relieve the serious shortage."

Under the heading "Default" the contract contained, *inter alia*, the following provision:

"(b) The Contractor shall not be liable for any excess costs if any failure to perform the contract arises out of causes beyond the control and without the fault or negli-

gence of the Contractor. Such causes include, but are not restricted to, acts of God or of the public enemy, acts of the Government, fires, floods, epidemics, quarantine restrictions, strikes, freight embargoes, unusually severe weather, and defaults of subcontractors due to any of such causes unless the Contracting Officer shall determine that the supplies or services to be furnished by the subcontractor were obtainable from other sources in sufficient time to permit the Contractor to meet the required delivery schedule."

The plaintiffs repeatedly endeavored to get released from the contract on the ground that it was impossible to fulfill the contract with hay purchased in Oklahoma as there was not sufficient hay to meet the demand and the farmers were refusing to sell it, and that the price had gone much higher than the rate specified in the contract. That even at that price there was not sufficient hay available to make delivery under the contract.

Just as repeatedly, the contracting officer insisted on the hay being delivered and stated that if the amount of hay were not delivered he would contract with others to make delivery and charge the additional cost against the plaintiffs.

Faced with these conditions, the plaintiffs purchased the hay wherever available and at whatever price that might be necessary in the State of Oklahoma, and in order to complete the contract made five purchases, as set out in finding 22, in the State of Nebraska.

It is stipulated by the respective parties to this litigation that the plaintiffs sustained a net loss of $17,298.48 in making delivery of the amount of hay specified in the contract. The plaintiffs sue for this amount, alleging that the contract relieves the contractor of any liability for excess costs if failure to perform arises out of certain causes not the fault or negligence of the contractor. One of the causes listed in the contract is unusually severe weather.

Anyone who has ever been in the fringe of the so-called "dust bowl" during the rare occasions on which these severe droughts sometimes prevail can realize the havoc that is wrought at such a time. The hot winds come and sweep with blistering trail across the prairies. The heavens become like brass and the earth as iron. The small streams go dry, the leaves wither and the growing grass becomes seared. Within a space of a few days tremendous damage can be done. The undisputed evidence in this case shows that the drought not only in Oklahoma but in some of the surrounding States was very severe during this period. Naturally the price of the limited hay available in that area increased very greatly.

There is little doubt that if plaintiffs had deliberately defaulted in their contract they would have been relieved of much of the damages and costs which they incurred by their completing delivery. They could simply have refused to deliver, but of course in that event the contracting officer would have charged them with the additional costs by offset.

Thus, in either event plaintiffs were faced with a law suit. The choice which the contracting officer gave them was somewhat like the choice sometimes given the cattle thief who might be captured by a group of citizens on the frontier in the early days. The story goes that one such rustler was taken in the act. The enraged owners gave him the choice of whether he would be "hung or shot." After studying the matter over, he replied that he could not develop any enthusiasm for either method.

It is to plaintiffs' credit, that in the face of the somewhat unreasonable demands of the contracting officer and regardless of the many thousands of dollars of extra costs, they completed delivery of the entire amount of hay specified in the contract. Plaintiffs went to many places in Oklahoma and secured all the hay they could find available, even at the increased prices. They

found it necessary to go to Nebraska for a portion of the hay in order to complete the contract.

█ It seems almost like placing a penalty on energy or integrity to deny the plaintiffs the relief which they seek, but the defendant insists upon the terms of the contract. Since the terms of the contract, especially when read in the light of the disputes clause, provide for relief only for failure to perform, we find that we have not the authority to grant the principal part of the relief which is sought in this action. There is, however, a portion of the claim which we think undoubtedly should be accorded the plaintiffs.

█ When the wording of the contract as a whole, the point of delivery contemplated by that contract, and the accessibility of the normal supply of hay for that particular section are considered in connection with the correspondence and the evidence by both sides, there is a conclusive showing that the source of supply which both parties contemplated was the area not exceeding a reasonable distance from the point of delivery. This conclusion is made much more plausible when the bulky nature of the commodity is given consideration. The evidence shows that when shipped from any considerable distance the freight costs exceeded the price of the hay. It will be noted from a reading of the citations set out below, the general rule is that difficulty of performance or losses in carrying out a contract will not be treated as a basis for relief by the courts in the absence of a special clause in the contract stipulations providing for such relief, both parties being bound by the terms of the contract. But in extraordinary cases where extreme hardship, unforeseen and not contemplated by either party, would necessarily result, a measure of relief may be granted if the unusual circumstances justify such action. This is the very essence of equity, which is the peculiar product of English and American jurisprudence. See 6 Williston on Contracts (Rev. Ed.) § 1963; also Restatement of the Law of Contracts §§ 454 and 460 for a discussion of the general rule and the exceptions.

In the case of Mitchell Canneries, Inc. v. United States, 77 F.Supp. 498, 503, 111 Ct.Cl. 228, at page 250, is found this language:

"It might be pointed out here that regardless of whether or not a contract provides for findings, there must be some reasonable limit to the area from which a contractor can be expected to acquire raw materials in performance of a contract. If the doctrine that a contractor may not be excused when materials are available anywhere, at any price, were carried to its logical conclusion, it would follow that there would have to be complete crop failure over the entire surface of the world before a contractor could be relieved from damages. If some small quantity of materials had been available in some distant country, a contractor could not be excused. The blackberry crops in Oregon and Washington from which the government purchased materials in the open market when the contractor could not complete the contract here involved, were so far from the contractor as to be practically out of his reach. The contract was made during time of war to be performed when transportation was difficult and space in refrigerator cars for shipment of perishable goods was painfully inadequate. These facts have bearing on the reasonableness of the contracting officer's findings. It would be an unconscionable result to hold the contractor liable for damages for failure to complete the contract when the raw material was actually unobtainable."

While this language was used in a case in which there was an actual default, its philosophy and meaning certainly apply to the six railroad cars of hay purchased by the plaintiffs and shipped from Thompson Company, Newport, Nebraska, which can certainly be termed out of the

range of the parties in entering into the contract in question. We hold that it was contemplated and well understood by both parties that in delivering hay under the contract the plaintiffs expected to obtain it, and the defendant expected to receive it, from sources not unreasonably distant from the delivery point contained in the contract, and that Newport, Nebraska, where plaintiffs were compelled to go to purchase the six carloads of hay mentioned, was an unreasonable distance and clearly beyond the area in contemplation of both parties to the contract.

The extra cost of delivering these six carloads of hay as set out in finding 22 is $1,480.32. Judgment will be rendered for plaintiffs in this amount.

It is so ordered.

FAHY, Circuit Judge, sitting by designation, and MADDEN and LITTLETON, Judges, concur.

WHITAKER, Judge, dissents.