**TONY DOWNS FOODS COMPANY**

v.

**The UNITED STATES.**

**No. 358–74.**

United States Court of Claims.

Feb. 18, 1976.

Leo E. Fitzgibbons, Estherville, Iowa, atty. of record, for plaintiff. John G. Martens, Fitzgibbons Brothers, Estherville, Iowa, of counsel.

Susan M. Linden, Washington, D. C., with whom was Asst. Atty. Gen., Rex E. Lee, Washington, D. C., for defendant.

Before DURFEE, Senior Judge, and SKELTON and BENNETT, Judges.

ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

DURFEE, Senior Judge:

In the past this court has dealt with a variety of claims involving animals, in-

cluding two dogs and a cat,[1] horses,[2] geese,[3] chickens[4] and now in this case, turkeys. Plaintiff entered into two contracts to supply the United States Department of Agriculture with canned turkey and chicken parts for the Department's school lunch program. The contracts called for delivery of the poultry products at specified times at a fixed-price per pound. Plaintiff bid on the first contract (June contract)[5] on June 19, 1973 to supply defendant with 1,552,-950 pounds of poultry at $.9191 per pound for a total contract price of $1,427,316.55. This bid was accepted and the contract awarded to plaintiff on June 21, 1973. Deliveries on this contract were due between August 1 and August 15, 1973. On July 16, 1973, plaintiff bid on the second contract (July contract).[6] This bid offered to supply 887,400 pounds of poultry products at $.9691 per pound for a total contract price of $860,689.26. Defendant accepted this bid and awarded plaintiff the contract on July 20, 1973 with delivery due between September 2 and September 15, 1973.

At the time plaintiff computed and submitted its bids on both its June and July contracts a comprehensive price freeze was in effect on the price of all commodities and services offered for sale (with certain irrelevant exceptions). This price freeze, one of the various phases of the President's Economic Stabilization Program, was imposed by Executive Order 11723[7] on June 13, 1973. The Executive Order imposing the price freeze provided that it would remain in effect for an indefinite period not exceeding 60 days. On July 18, 1973, before the performance date(s) of plaintiff's contracts and prior to defendant's acceptance of plaintiff's July contract bid, the price freeze was terminated by Executive Order 11730.[8]

Following the termination of the price freeze, the previously stabilized price of poultry[9] needed by plaintiff to fulfill its contract and upon which plaintiff had computed its bids rose. After the termination of the price freeze, plaintiff's cost per pound for turkey rose from $.5051 to $.6970. Plaintiff's chicken costs increased from $.3728 to $.57 per pound.

Plaintiff timely performed both of its contracts but due to the increase in poultry prices did so at an aggregate loss of $312,009.84 on the two contracts.

By letter dated August 9, 1973, plaintiff requested price relief from the Contracting Officer on account of the losses it sustained on the two contracts. The Contracting Officer denied this request because, as he advised plaintiff, he had "no authority, either under the contracts or the price stabilization program, to renegotiate contract prices." The Agriculture Board of Contract Appeals dismissed plaintiff's timely appeals for lack of jurisdiction characterizing plaintiff's appeals as raising questions of law only.

Plaintiff brings this suit, under the Wunderlich Act (41 U.S.C. §§ 321, 322 (1970)), seeking recovery of its excess contract performance costs allegedly caused by the termination of the President's price freeze prior to plaintiff's performance of either supply contract. Defendant acknowledges plaintiff's losses in the performance of its contracts and the precipitation of those losses by

1. *Pedersen v. United States,* 115 Ct.Cl. 335 (1950).

2. *Pauly v. United States,* 152 Ct.Cl. 838 (1961).

3. *McGuire v. United States,* 305 F.2d 449, 158 Ct.Cl. 285 (1962).

4. *Wilfong v. United States,* 480 F.2d 1326, 202 Ct.Cl. 616 (1973).

5. Contract No. 12–25–3–4685.

6. Contract No. 12–25–4–4002.

7. 3A CFR 1973 Comp., p. 184.

8. 3A CFR 1973 Comp., p. 197.

9. While the price freeze imposed by Executive Order 11723 did not apply to raw agricultural products, neither party contends that plaintiff's costs of its raw materials, e. g., turkey and chicken, were not subject to the price freeze. As the record demonstrates nothing to the contrary, the court accepts the parties' representations that plaintiff's raw material costs were subject to the price freeze.

the termination of the price freeze. However, in spite of these acknowledgments, defendant maintains its contractual immunity for those losses. The case comes before the court on the parties' respective motions for summary judgment, there being no dispute as to the operative facts of the controversy. For the reasons set forth below, plaintiff is not entitled to recovery, and its motion for summary judgment is denied. Defendant's summary judgment motion is granted, and plaintiff's petition dismissed.

In its petition, plaintiff divided its claim(s) into two counts. Count I deals with plaintiff's July contract and seeks recovery of excess performance costs in the amount of $209,204.55. Count II seeks recovery of $102,805.29 for losses plaintiff sustained on its June contract. For chronological purposes, plaintiff's respective counts will be treated in reverse order.

### Count II—June Contract

As Count II of its petition, plaintiff seeks price relief for its excess performance costs on its June contract. Plaintiff predicates its Count II claim on the singular contention that the termination of the existing price freeze by Executive Order with the attendant increase in the cost of plaintiff's raw materials gives rise to a compensable contract claim. Plaintiff cites no contract provision in support of its position. Plaintiff's contract did not contain a price escalation clause, a changes clause nor had plaintiff secured firm price commitments from its suppliers. Rather, plaintiff seeks recovery on the sole ground that "the unilateral action of the Defendant (Executive Order 11730) made the contract burdensome, oppressive and destructive of the Plaintiff's business." Pltf's pet. p. 18, ¶ 18.

The Supreme Court has provided the short answer to this argument. "It has long been held by the Court of Claims that the United States when sued as a contractor cannot be held liable for an obstruction to the performance of the particular contract resulting from its public and general acts as a sovereign." *Horowitz v. United States,* 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736, 737 (1925). The Supreme Court's *Horowitz* decision specifically validated an early holding of this court that:

> " * * * The two characters which the government possesses as a contractor and as a sovereign cannot be thus fused; nor can the United States while sued in the one character be made liable in damages for their acts done in the other. Whatever acts the government may do, be they legislative or executive, so long as they be public and general, cannot be deemed specially to alter, modify, obstruct or violate the particular contracts into which it enters with private persons * * *. In this court the United States appear simply as contractors; and they are to be held liable only within the same limits that any other defendant would be in any other court. Though their sovereign acts performed for the general good may work injury to some private contractors, such parties gain nothing by having the United States as their defendants." *Jones v. United States,* 1 Ct.Cl. 383, 384–385 (1865).[10]

■ While it is conceded that the termination of the price freeze obstructed plaintiff's contract performance and made it more costly, plaintiff does not contend that the termination of the price freeze was other than a public and general act for the general good issued in the exercise of the soverign power of the United States. Such an argument would undoubtedly be futile.[11] Plaintiff's fail-

---

10. 267 U.S. at 461, 45 S.Ct. at 344, 69 L.Ed. at 737.

11. *See, Hallman v. United States,* 68 F.Supp. 204, 107 Ct.Cl. 555 (1946); *Piggly-Wiggly*

*Corp. v. United States,* 81 F.Supp. 819, 112 Ct.Cl. 391 (1949); *Barnes v. United States,* 105 F.Supp. 817, 123 Ct.Cl. 101 (1952); *Anthony P. Miller, Inc. v United States,* 161 Ct.Cl. 455, *cert. denied,* 375 U.S. 879, 84 S.Ct. 149, 11

ure to challenge the character of the Executive Orders herein at issue renders unnecessary an extended discussion of their public and general nature or that they were unquestionably promulgated ·for the general good. Suffice it to say that in *McCrary v. United States,* 84 F.Supp. 368, 114 Ct.Cl. 12 (1949), the court found the Government immune from damages resulting to a contractor from the imposition of an Executive Order labor freeze, akin to the instant Executive Order price freeze, holding such damages to be unrecoverable as *damnum absque injuria. McCrary v. United States, supra,* 84 F.Supp. at 371, 114 Ct.Cl. at 36.

In its written submission to the court, plaintiff presented neither argument nor authority to refute defendant's well presented and comprehensive argument that defendant is contractually immune from liability for the sovereign acts of the United States. Besides failing to respond to the Government's defense presented in its summary judgment motion, plaintiff, in its motion for summary judgment, advanced neither argument nor authority in support of its own position.

Plaintiff's latter failing prompted defendant to ask the court to treat plaintiff's Count II claim as abandoned. At oral argument, plaintiff's counsel urged reliance on *Dillon v. United States,* 156 F.Supp. 719, 140 Ct.Cl. 508 (1957), as precedent for allowing plaintiff recovery on Count II of its petition. The marked differences between the *Dillon* case and the instant dispute do not readily lend themselves to valid comparison between the two cases nor provide persuasive ground for allowing plaintiff recovery.

In *Dillon v. United States, supra,* the court allowed a hay supply contractor his excess performance costs occasioned by a severe drought in the contemplated contract performance area. This case turned on a conclusive showing of the comtemplated conditions incident to the hay supplier's contract performance, and the fact that the contractor's excess costs were brought about by an unforeseen natural disaster. None of these controlling circumstances are present in the instant case.

The instant case lacks any evidence as to an understanding between the parties regarding either the price stability of poultry or the continued existence of the previously imposed price freeze. The contract contained no recitals either affording plaintiff relief for increased performance costs or guaranteeing the continued existence of the price freeze. The Executive Order imposing the price freeze, incorporated by reference into the parties' contract, specified that the price freeze would be effective for an indefinite period not exceeding 60 days. Further, the Department of Agriculture had continually advised poultry suppliers of changes affecting their contemplated methods of contract performance and consequently their costs through Announcements to the Market. Up to the time of the termination of the price freeze, the Agriculture Department had issued three such notices, each imposing additional conditions on poultry suppliers. These factors, fortified by the absence of any contrary showing by plaintiff, readily evidence the continual changes under which such suppliers operated and militates against any conclusive showing that the parties entered the contracts under a preconceived understanding of economic stability as a contemplated condition to their contracts. Such a showing is not only absent from the present case but the record rebuts any inference that continued price stability was a contemplated condition of the parties' contract.[12]

L.Ed.2d 111 (1963); *Amino Brothers Co. v. United States,* 372 F.2d 485, 178 Ct.Cl. 515, *cert. denied,* 389 U.S. 846, 88 S.Ct. 98, 19 L.Ed.2d 112 (1967); *Glasgow Associates v. United States,* 495 F.2d 765, 203 Ct.Cl. 532 (1974).

12. *Cf. McNamara Construction of Manitoba, Ltd. v. United States,* 509 F.2d 1166, 206 Ct.Cl. 1 (1975).

■ The contractor's losses in *Dillon* were brought on by an unforeseen natural disaster. There can be no comparison between contract losses caused by an unanticipated natural disaster and additional contract performance costs occasioned by the deliberate Government imposition of economic controls, the latter being an exercise of sovereign power for which the Government bears no contractual responsibility. Moreover, the removal of temporarily imposed price controls cannot legitimately be viewed as unforeseeable or beyond reasonable anticipation, especially at a time when the Government was actively utilizing a variety of measures to produce economic stability. The Executive Order imposing the price freeze, prior to plaintiff's bidding on either contract, specified that the price controls were temporary, and of indefinite duration up to a maximum of 60 days. This Executive Order further raised the flag of future changes by directing the Cost of Living Council to formulate additional economic control policies, mechanisms and procedures. In light of these circumstances, circumstances which plaintiff, as an experienced business enterprise, should have been aware of,[13] it cannot be reasonably concluded that plaintiff's losses resulted from unanticipated or unforeseeable events. Consequently, the *Dillon* decision has no application to the facts of this case. Applicable to this case, however, is the general rule stated in *Dillon* that " * * * difficulty of performance or losses in carrying out a contract will not be treated as a basis for relief by the courts in the absence of a special clause in the contract stipulations providing for such relief, both parties being bound by the terms of the contract." *Dillon v. United States, supra,* 156 F.Supp. at 722, 140 Ct.Cl. at 512–513.

The validity of defendant's immunity defense, barring its contractual liability for a contractor's losses resulting from the exercise of the Government's sovereign powers, coupled with the absence of the factors giving rise to the contractor's recovery in *Dillon,* precludes plaintiff's recovery on its Count II claim.

### Count I—July Contract

■ Count I of plaintiff's petition seeks recovery for plaintiff's excess performance costs on its July contract. As with Count II, plaintiff's Count I claim would also be barred by defendant's immunity defense if plaintiff's July contract is valid, and plaintiff's claim for excess performance costs was based on the termination of the price freeze. Plaintiff attempts to avoid the sound defense of sovereign immunity by advancing the unique but nonetheless meritless argument that the termination of the price freeze created an error in its bid which the Contracting Officer failed to detect. Hence, plaintiff argues that the Contracting Officer wrongfully accepted plaintiff's July bid, and a valid contract was not created by the Contracting Officer's wrongful acceptance and award of the July contract to plaintiff.

The thorough and comprehensive discussion of parties' rights, obligations and remedies for bid mistakes in *Wender Presses, Inc. v. United States,* 343 F.2d 961, 170 Ct.Cl. 483 (1965) provides an authoritative starting point for consideration of plaintiff's Count I claim. *Wender Presses* began with the observation that " * * * although an award normally results in a binding contract fixing the parties' rights and obligations (*United States v. Purcell Envelope Co.,* 249 U.S. 313, 39 S.Ct. 300, 63 L.Ed. 620 (1919)), so that 'Ordinarily no relief will be granted to a party to an executory contract in the case of a unilateral mistake', *Saligman v. United States,* 56 F.Supp. 505, 507 (E.D.Pa., 1944), nevertheless an acceptance of a bid containing a palpable, inadvertent, error cannot result in an enforceable contract." *Wender Presses, Inc. v. United States, supra,* 343 F.2d at 962–963, 170 Ct.Cl. at 486. This is because "Absent mistake, if bids or modifications thereof could be with-

---

13. *Franklin Co. v. United States,* 381 F.2d 416, 180 Ct.Cl. 666 (1967).

drawn after the results of the bidding were made known 'frauds innumerable could be perpetrated against the United States.' *Scott v. United States,* 44 Ct.Cl. 524, 527 (1909)." *Condec Corp. v. United States,* 369 F.2d 753, 759, 177 Ct.Cl. 958, 968 (1966). Thus, plaintiff to recover on its July contract must show that " * * * defendant's responsible officials knew or should have known of the mistake at the time the bid was accepted." *Wender Presses, Inc. v. United States, supra,* 343 F.2d at 962, 170 Ct.Cl. at 485. "Plaintiffs must also show that the contracting officer overreached them by accepting their bids though he knew or should have known they were mistaken." *Ruggiero v. United States,* 420 F.2d 709, 716, 190 Ct.Cl. 327, 339 (1970).

Plaintiff's burden in making these showings is to adduce factors which under the facts and circumstances of the particular case should reasonably have raised the presumption of error in the mind of the contracting officer. *Wender Presses, Inc. v. United States,* 343 F.2d at 963, 170 Ct.Cl. at 486; *Chernick v. United States,* 372 F.2d 492, 496, 178 Ct.Cl. 498, 504 (1967); *Space Corp. v. United States,* 470 F.2d 536, 540, 200 Ct.Cl. 1, 19 (1972); Welch, *Mistakes in Bids,* 18 Fed.B.J. 75, 83 (1958). Several of the factors which raise the presumption of error are collected in Doke, *Mistakes in Government Contracts—Error Detection Duty of Contracting Officers,* 18 Sw.L.J. 1 (1964). Extended discussion of classical mistake factors is unnecessary as plaintiff does not rely on any of them, and even concedes that it is unable to find a case in direct support of its position.

██ Plaintiff's inability to find a supporting case doubtlessly stems from the basic flaw in plaintiff's argument. There is no mistake in plaintiff's bid. Legally, for there to be a mistake there must be a discrepancy between an offerer's state of mind and his offer. Restatement, Contracts § 500 (1932); 5 Williston, Contracts § 1535 (Rev. ed. 1937). *See, Russell & Pugh Lumber Company v. United States,* 290 F.2d 938, 941, 154 Ct.Cl. 122, 127 (1961). Plaintiff in submitting its bid stood ready to perform the contract according to its conditions at the price stated in its bid.

██ Plaintiff's losses on its July contract were not the product of a difference in plaintiff's state of mind and its bid. Rather, as plaintiff acknowledges the losses resulted from the termination of the price freeze. Changes in economic conditions do not create mistakes. Mistakes are committed, not created. Certainly, between two private parties, plaintiff could not recover for the termination of the price freeze, Restatement, Contracts § 467 (1932); 6 Williston, Contracts § 1963 (Rev. ed. 1938); *see,* 17 Am.Jur.2d, Contracts § 402 (1964), and when contracting the Government must be regarded as a private party. *Cooke v. United States,* 91 U.S. 389, 23 L.Ed. 237 (1875).

Plaintiff, in its Count I plea for relief based on the theory that the termination of the price freeze created a mistake in its bid, cites several decisions of this court, some of which are noted above, including *Ruggiero v. United States, supra.* That case, rather than supporting plaintiff's mistake argument, delivers the *coup de grace:*

> * * * The mistake, to invoke such principles [recision or reformation], must be, as in the cases cited, a clear cut clerical or arithmetical error, or misreading of specifications, and the authorities cited do not extend to mistakes of judgment. * * * *Ruggiero v. United States, supra,* 420 F.2d at 713, 190 Ct.Cl. at 335.

██ The mistake in plaintiff's bid, if any, resulted not from any clear cut clerical, arithmetical or specification misreading error or a difference between what plaintiff intended to bid and its actual submitted bid. The mistake resulted from plaintiff's mistaken judgment as to economic conditions, and the continued existence of the price freeze, a mistake for which relief cannot be granted.

Plaintiff's legal argument, while novel, can neither be supported nor sustained, and plaintiff cannot recover on its July contract on a mistake-in-bid theory.

Lastly, plaintiff, while quick to impute liability to defendant, seemingly ignores its own culpability for its July contract losses. The price freeze was terminated on July 18, 1973. Plaintiff's bid was not accepted until July 20, 1973. If, as plaintiff says, "[t]he impact of the lifting of the price controls was swift and sure in coming and to be anticipated",[14] plaintiff had two days in which to withdraw or modify its bid. The contract authorized bid modifications or withdrawal by mail or telegram up to the time of bid opening. Plaintiff's failure to withdraw or modify its bid, in the face of what it describes as immediate poultry price increases,[15] is both telling and not without legal significance.

■ Even with the sure, swift and immediate rise in poultry prices following the July 18, 1973 termination of the price freeze, plaintiff waited until August 9, 1973 to bring its cost increases problems to the attention of the Contracting Officer. In view of plaintiff's actions, it is difficult to accept its contention that the Contracting Officer knew or should have known of the mistake in plaintiff's bid created by the termination of the price freeze, when plaintiff with a two-day opportunity to withdraw its bid not only took no action but even remained silent for more than three weeks. Equally, it is doubtful whether on the termination of the price freeze, had the cost of poultry declined, that plaintiff would have clamored with as much vigor for a decrease in its bid price. Plaintiff's apparent wait and see attitude cannot be condoned.

■ Plaintiff might well have considered the merits of utilizing a price escalation clause, or securing a firm price commitment from its suppliers before entering into these contracts. A Government contractor, regardless of its size, locality or experience, is bound to understand the complexities and consequences of its undertaking. *Massachusetts Port Authority v. United States,* 456 F.2d 782, 784, 197 Ct.Cl. 721, 726 (1972).

Plaintiff's June and July supply contracts are valid and enforceable according to their terms. Plaintiff is not entitled to recovery on either of these contracts.

Plaintiff's motion for summary judgment is denied, and its petition is dismissed. Defendant's motion for summary judgment is granted.