710

**INTERNATIONAL VERBATIM
REPORTERS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 458–80C.

United States Claims Court.

March 26, 1986.

Louis Rabil, Washington, D.C., for plaintiff. Gregory A. Cotter, of counsel.

Michael J. Denton, with whom was Asst. Atty. Gen. J. Paul McGrath, for defendant. Patricia R. Davis, of counsel.

## OPINION

MOODY R. TIDWELL, III, Judge:

This proceeding, brought directly before the Court of Claims, the predecessor court of the United States Claims Court, by International Verbatim Reporters, Inc. (IVRI), seeks damages for breach of contract by the government, acting through the Nuclear Regulatory Commission (NRC), and to correct an alleged improper termination for default by transforming it into a termination for convenience of the government pursuant to the provisions of the default clause of the contract.

Three and one-half months after award of the two-year contract, defendant terminated the contract for default. Plaintiff contends that the termination for default was procedurally defective, substantively without merit and in fact, a breach of the contract by defendant. Plaintiff also alleges that defendant was in material breach of the contract at the time of and prior to the termination for default. Defendant denies any wrongdoing, substantive or procedural, and has filed a counterclaim against plaintiff for reprocurement costs attributable to the termination for default. After filing, it was agreed that the trial would be limited to the issue of liability.

After careful review of the transcripts, briefs, proposed findings of fact and documentary evidence, the court finds that the termination for default was proper. Plaintiff's charges of breach of contract by defendant have not been proven, the default termination shall not be converted into a termination for the convenience of the government, plaintiff is not entitled to any costs and is liable for the reprocurement costs. The Petition (now Complaint) is dismissed.

## FACTS

On August 14, 1979 the United States acting through the NRC issued Invitation for Bids (IFB), NRC 17–80–448–01, for a formally advertised, two-year, firm fixed-price contract to provide stenographic reporting services. Under Lot 1 of 3 the contractor would be mostly responsible for reporting the open, or "sunshine," meetings of the Commission, the Atomic Safety and Licensing Boards, Atomic Safety & Licensing Appeal Boards and the Advisory Committee on Reactor Safeguards. Lots 2 and 3 in the IFB are not in issue because plaintiff was low bidder on Lot No. 1 only.

■ Plaintiff's bid was timely and by use of the bid evaluation schedule contained in the IFB, plaintiff was determined to be the low responsive bidder on Lot No. 1. The contracting officer, and others within NRC, were of the opinion, however, that plaintiff could not adequately perform the heavy and complex workload expected under the contract because of plaintiff's small size, it being a very new company and having no experience in reporting defendant's hearings.[1] Two pre-award surveys were conducted by defendant both of which recommended that Lot No. 1 of the contract not be awarded to plaintiff for the aforesaid reasons, all of which solidified the contracting officer's opinion that plaintiff was not a responsible bidder.[2] Section C.30 of the IFB delineated the requirements defendant was seeking in its contractor:

C.30 BIDDERS QUALIFICATIONS

(a) Bidders must be regularly engaged in the stenographic reporting business and have adequate personnel and facilities, including equipment, in the Washington, D.C. Metropolitan Area to assure satisfactory completion of the terms and conditions of this contract. Inasmuch as the service contemplated by this solicitation is of such a nature that delays, errors, and other forms of unsatisfactory performance would jeopardize the interests of the Commission, bidders who submit bids in response to this solicitation may be required to furnish evidence of their experience in satisfactorily reporting proceedings of the type covered by this contract. The subject matter to be recorded at the adjudicatory hearings and oral arguments before Atomic Safety and Licensing Boards and Appeal Boards, and at meetings of the

Advisory Committee on Reactor Safeguards and other advisory committees is very complex and of a highly technical nature primarily in the field of nuclear reactors and nuclear energy. Less technical but equally demanding are meetings, often extremely informal, to be recorded in compliance with Government in the Sunshine, portions of which may be highly sensitive. Also sensitive are personnel security interviews conducted by the Division of Security which must always be recorded in a situation of utmost confidentiality. Workshops conducted by the Office of State Programs or other offices are held in various locations throughout the country which often require multiple, simultaneous reporting. In addition bidders may be required to furnish evidence of their business reliability, their financial responsibility, and their physical means (including equipment) to undertake the job and properly perform the work. Further, the bidder must be able to demonstrate that it can, primarily with its own employees or individuals currently under direct contract with the bidder perform work which may be necessary for the successful bidder(s) to cover eight to ten hearings and/or meetings being conducted on the same day(s) at different locations. The successful bidder(s) must possess the capability to perform 90% of the work with its own employees or individuals currently under direct contract with the bidder(s).

Because plaintiff was a small business, the contracting officer submitted the issue of responsibility to the Small Business Administration (SBA) as required for a determination of responsibility. 15 U.S.C. § 637(b)(7) (1982). *See also* FPR § 1–1.-

---

[1] The IFB indicated a total of 151,506 pages would be required of the contractor during the two-year life of the contract.

[2] FPR 1–2.407–2, "Responsible bidder", states that "Before awarding the contract, the contracting officer shall determine that a prospective contractor is responsible. *See* FPR 1–1.310, *et seq.* for a detailed listing of the criteria which

must be met in order to be determined a "responsible bidder." A bidder is not responsible if it fails to meet certain standards indicating that it does not have the necessary manpower, financing, ability, desire, perseverance, equipment, experience, and so forth which cumulatively would indicate that the bidder lacked the ability successfully to complete the contract.

708, *et seq.* The SBA quickly determined that plaintiff was responsible, despite the contracting officer's strong and lengthy entreaties to the contrary. A Certificate of Competency (COC) was issued by SBA.[3] Thereafter, on January 19, 1980, nearly 5½ months after opening of bids, and five weeks after issuance of the COC, defendant very reluctantly and after much procrastination, awarded a contract to plaintiff for Lot No. 1.

Shortly afterwards complaints from defendant's personnel and others involved with defendant, about plaintiff's performance began to trickle in. Defendant argued, in effect, that the longer plaintiff performed under the contract the larger the trickle grew until it finally became a raging torrent of dissatisfaction with no hope that plaintiff would ever be able to competently perform the contract.

It is clear that during performance of the contract, plaintiff experienced severe growing pains which clearly had an adverse effect upon its ability to produce transcripts of the high quality and timeliness demanded by defendant. There were several quality standards in the solicitation in addition to section C.30, *supra.* For example, section F.1 required that:

a. *Performance.* The Contractor shall promptly provide as many competent stenographers and maintain such staff and equipment as may be necessary for the furnishing of satisfactory transcripts in accordance with the requirements of this contract. *All work shall be performed in a business-like manner. It shall conform to the best standards of the reporting profession.* (Emphasis added.)

\*       \*       \*       \*       \*       \*

c. *Reporting.* Everything spoken during a hearing shall be reported and incorporated into the transcript unless the Presiding Officer otherwise directs. This shall include a record of appearances, with the names and identification of the parties who actually testify or speak at the proceedings or who request the entering of their appearance, together with such other matters as may be directed by the Presiding Official to be included. Nothing spoken at the proceedings shall be "off the record" unless so designated by the Presiding Officer. No part of the proceedings, notes of which have been taken, shall be omitted from the record unless the Presiding Officer so directs. A full and complete verbatim record shall be made and transcribed.

\*       \*       \*       \*       \*       \*

e. *Accuracy.*
(1) It shall be the responsibility of the Contractor to furnish complete transcripts which accurately reflect the full and complete verbatim record of the hearing. If electronic sound devices are used, they must be of such quality as to insure against error, misinterpretation, or loss of voice. Equipment must be operator monitored and include simultaneous playback, listening, pre-amplification and speaker identification facilities.
(2) Where errors attributable to the Contractor's performance appear in the transcript (i.e., those which change or obscure the meaning of the testimony, but not including typographical errors or misspelling, if the intended meaning is clearly evident, such as "thier" for "their" or "teh" for "the", etc.) in the excess of one (1) error per 100 words of transcript the Commission may demand and the Contractor shall correct the errors and furnish corrected transcripts within five (5) calendar days after receipt of notification, and without additional cost to the Commission for same regardless of the delivery time the original order specified.

The court, in reading these terms together, is of the opinion that the contract set a

---

**3.** 15 U.S.C. § 637(b)(7)(C) (1982 & Supp. II 1984) provides that: "In any case in which a small business concern ... has been certified by the Administration ... to be a responsible Government contractor ... the officers of the Government having procurement ... powers are directed to accept such certification as conclusive ...." In other words, no appeal.

subjective and high quality standard for the contractor. To defendant's detriment, the record also indicates that with but a few exceptions defendant did very little of substance to assist plaintiff overcome its growing pains and become a successful contractor. After producing 165 transcripts in 3½ months, defendant terminated plaintiff's contract for default on May 2, 1980, because of substandard performance.

The termination notice dated May 2, 1980 identified three grounds for the contracting officer's decision to terminate the contract for default: (1) the delivery of inaccurate, unintelligible and poorly punctuated transcripts, (2) the failure to make timely delivery of the transcripts, and (3) the failure to comply with the contract term requiring personnel security clearances. Plaintiff alleged that defendant breached the contract by failing to permit it to report all hearings; reproducing transcripts itself instead of requesting reproduction work by plaintiff as required by the contract and; taking improper payment discounts.

## DISCUSSION

■ To demonstrate that defendant's decision to terminate plaintiff's contract was arbitrary and capricious, plaintiff must show there was no reasonable basis for the adverse administrative decision or that the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations. *Olympia USA, Inc. v. United States*, 6 Cl.Ct. 550, 554 (1984). It is true that the contracting officer has discretion, but it is not unbridled and it must be exercised in a fair and reasonable manner, not arbitrary and capricious, and always in the best interest of the government. *Udis v. United States*, 7 Cl.Ct. 379, 387 (1985).

The default clause of the contract is lengthy and need not be set forth in full in this opinion. Essentially, it provides that the government may terminate a contract

(1) without prior written notice if the contractor fails to provide timely performance of its services, and (2) with a written notice identifying the failure(s) by the contractor of any terms of the contract, other than the delivery date(s) and allowing the contractor a minimum of 10 days (or more as determined by the contracting officer) to "cure" the failure(s). The clause also provides for reprocurement costs to be assessed against the defaulted contractor, automatic reversion of the termination of default to a termination for the convenience of the government if the contractor is later found not to have been in default and an escape clause for the contractor which renders it not liable for reprocurement costs if the failure to perform arose out of causes beyond the control of and without the fault or negligence of the contractor.

■ A termination for default is a harsh remedy, as is made amply clear in this instance, but when the court is convinced that the defendant exercised proper judgment in terminating the contract for default the court will not substitute its judgment for that of the contracting officer. *Northrop Carolina, Inc. v. United States*, 213 Ct.Cl. 670, 553 F.2d 105 (1977). The court will now address the three reasons given by the contracting officer to terminate plaintiff's contract for default:

### *The Delivery of Inaccurate, Unintelligible and Poorly Punctuated Transcripts*

■ The solicitation and resulting contract required the contractor to do its work "in a business-like manner," conforming to "the best standards of the reporting profession." It called for a "full and complete verbatim record" of proceedings with nothing omitted from the record and, for "complete transcripts which accurately reflect the full and complete verbatim record of the hearing." [4] The court is of the opinion

**4.** In defendant's letter to plaintiff of February 14, 1980, approximately one month after award, specific reference was made to late deliveries, poor transcripts, problems associated with delivery of transcripts to defendant, and other mat-

ters. In response to plaintiff's complaints about defendant's procedures, the contracting officer stated, in part, that: "The solicitation which [plaintiff] responded to specifically stipulated that NRC work is very complex, highly techni-

that the performance standards which plaintiff contracted to meet, were to provide transcripts which a reader reasonably familiar with the subject matter at hand could read and understand. This included proper identification of the speaker, accurate reporting of what was said, proper punctuation, inclusion of all matters which should be included and exclusion of all matters which should be excluded from the transcript. The court is aware of the fact that practically all transcripts contain errors, but oftentimes they are of the type that can be interpreted, or are not critical in nature. In those rarer instances where errors in the transcript are indecipherable but crucial to an argument or resolution of an issue, the transcript is unacceptable.

Defendant was of the position that a number of plaintiff's transcripts were, in at least some instances, so garbled that they could not be deciphered and made readable. Defendant does not say that all of plaintiff's 165 transcripts were troublesome but bases its case on the fact that more than a few were particularly incoherent in potentially crucial spots. The record reflects that of the 165 transcripts produced by plaintiff, defendant has based its case on 12 transcripts from the Rancho Seco proceedings, "approximately" 38 Advisory Committee on Reactor Safeguards transcripts, two transcripts from the Bailey ASLBP hearings, three transcripts from the Salem ASLBP hearings and two transcripts from the Comanche Peak hearings. Defendant says plaintiff also missed 15 minutes of crucial cross-examination in the Rancho Seco hearings and that there were 12 gaps in the two Comanche Peak transcripts when plaintiff failed to halt proceedings while changing recording tapes as specifically required by the contract. Defendant alleges that of the 165 individual transcripts furnished by plaintiff, 63 contained significant errors and omissions.

It is true that some hearings were loud and raucous and that plaintiff, or its subcontractor, had difficulty in taping the hearings, however, it is also true that plaintiff did not always take reasonable or prudent steps to tape the hearings properly. Moreover, defendant taped its own hearings, as did plaintiff, and defendant's tapes were available at all times to plaintiff if its reporter missed what had been said. Plaintiff, notwithstanding the fact that it produced garbled transcripts never took advantage of this opportunity. Likewise, plaintiff's reporters failed to ask either during or following the hearing for the spelling of names and technical terms, etc. For example, at the Salem hearing, plaintiff misidentified speakers, transcribed sentences differently than actually spoken, omitted words, and added words that were never spoken. Similar problems arose in the Rancho Seco hearings. The administrative law judge who conducted the Salem hearing stated that frequent errors were made in the transcript but that the transcript was not returned to plaintiff for correction because it was deemed unlikely that the transcript would be any better the second time around. Defendant testified that there were as many as 22 errors per page in the Salem transcript and that a total of 280 corrections were made by defendant.[5]

The record of this trial is replete with similar horror stories. It is true that some of the errors were merely typographical or simple errors which could have been overlooked but the court believes that defendant was so anxious to default plaintiff that it lost its perspective in dealing with plaintiff. There were other methods of "disciplining" plaintiff other than by terminating

cal, and requires precision in its performance since delays, errors and any other forms of unsatisfactory performance would jeopardize the interest of the Commission."

5. It is true that defendant, in its zeal to exonerate itself from any contractual relationship with plaintiff, exaggerated the errors; such as by counting a missing comma, when the ordinary reader could have easily understood the meaning of the sentence. Nevertheless, defendant was correct that a number of incomprehensible errors also appeared in the transcripts. There were not 22 major, incomprehensible errors on every page of the Salem transcript, nor were 280 major, incomprehensible errors made in that transcript.

it for default, but defendant chose the harshest punishment it could in order to separate itself from what it had always perceived to be an unacceptable contractor. This is not, however, to say that defendant did not have the right to default plaintiff under the circumstances. Defendant stayed within the bounds of propriety—but just barely. Perhaps the most damning facts came in testimony from attorneys not employed by defendant who criticized plaintiff's transcripts as the "worst they had ever seen," and that it was "incomprehensible how plaintiff ever got the job in the first place," and that "transcripts were of the poorest quality ever seen." The portions of the transcripts discussed at trial were clearly unacceptable and it was those transcripts which later, in part, justified the termination for default.

In an attempt to avoid the consequences of its deficient performance under the contract, plaintiff invoked the doctrine of substantial performance to argue that its failure to completely perform the contract was excusable. Plaintiff argued that the contract was "substantially performed" and that defendant wrongfully used outrageously high performance standards and then claimed failure of performance when plaintiff's transcripts did not meet those standards, which, according to plaintiff, no reporter could have met. However, the doctrine of substantial performance is not available in this case to excuse the substantial deviations from acceptable performance present in the work produced by plaintiff. As the Court of Claims stated in *Franklin E. Penny Co. v. United States*, 207 Ct.Cl. 842, 524 F.2d 668 (1975):

> Admittedly, the purpose of the substantial performance doctrine is to avoid the harshness of a forfeiture. By the same token, however, the doctrine should not be carried to the point where the nondefaulting party is compelled to accept a measure of performance fundamentally less than had been bargained for. Substantial performance 'is never properly invoked unless the promisee has obtained to all intents and purposes all benefits which he reasonably anticipated receiv-

> ing under the contract.' (Citations omitted.)

*Id.* at 857–58, 524 F.2d at 677.

Plaintiff accuses defendant of "nitpicking," and, to some extent the court agrees. This, however, does not strengthen plaintiff's argument or change the conclusion of the court. The simple fact is that plaintiff failed substantially to produce transcripts that were timely, complete and could be read and understood by the average reader knowledgeable in the field of nuclear power. Defendant contracted for high quality stenographic reporting service, but instead received a product that was significantly flawed and caused serious disruption to the regulatory process. The court finds ample evidence that plaintiff failed to properly perform under the contract by submitting transcripts that were in a number of instances, unacceptable.

### Late Delivery of Transcripts

The late delivery of transcripts to defendant was a problem that plagued the parties from the beginning to the end of the contract. The IFB called for bids on transcripts to be delivered within ten days, five days, daily (8:15 a.m. the next day), or five hours. The shorter the delivery time the higher the price per page.

There was a great deal of testimony and documentary evidence taken on this issue, most of which was rambling and inconsistent. It is possible, however, to identify a general pattern which shows that numerous transcripts were delivered past the time they were due. Defendant took what can only be described as a hard line approach on the issue; testifying in some instances, as a justification for default, that all late transcripts should be treated as late even though they were only a few minutes late. One, for example, was four minutes late. The court finds, nevertheless, that a respectable number of transcripts were, in fact, delivered late. "Late", however, must be put into context. The IFB recited that most transcripts would have to be delivered on a daily basis,

*e.g.*, delivery by 8:15 a.m. the next day. The court finds, that on the weight of the testimony given, plaintiff failed to a significant degree to meet the delivery requirements of the contract. For example, on one set of delivery receipts relied upon by defendant 16 of 128 (13%) of the transcripts delivered were on time and 112 (87%) were late. Of the 112 that were late, 24 (21%) were less than an hour late; 52 (46%) were between one and four hours late; 13 (12%) were between four hours and one day late; 22 (20%) were between one and four days late and one was greater than four days late.

Plaintiff does not deny that it made late deliveries on numerous occasions. However, plaintiff attempts to excuse this admitted default by arguing, first, that its lateness was "immaterial and inconsequential" and, second, that the NRC's alleged failure to enforce delivery schedules with other contractors precludes the NRC from enforcing the delivery schedule against plaintiff. Neither of these arguments has merit.

The predecessor reporting company, Ace Federal Reporters, had 432 delivery receipts with 132 (31%) on time. The successor contractor, Alderson Reporting Co., Inc., had 289 delivery receipts with 253 (88%) on time. Plaintiff argued that the latter statistics sustain its position that the preceding and subsequent reporting companies were given more latitude in late deliveries of transcripts. The court finds to the contrary. The comparative statistics reveal that plaintiff was ostensibly timely with its deliveries 13% of the time; Ace Federal Reporters, 31% of the time; and Alderson Reporting Co., Inc., 88% of the time. There is no magical formula for determining when a stenographic reporting company is being treated differently from its competitors, but when the range of timely deliveries runs from 13% to 31% to 88% the court can find that plaintiff's argument is faulty and unpersuasive. This conclusion is not altered by the fact that Ace was never terminated for default. Ace not only made fewer late deliveries than plaintiff but tendered fewer deficient tran-

scripts. Defendant also had no problem with Ace's progress in requesting security clearances, *infra*.

▮ Plaintiff's argument that its lateness was immaterial and inconsequential must be rejected after even a brief review of the record. Plaintiff delivered 87% of its transcripts late. Even if the degree of lateness extends for only one or two hours, it could have been, and apparently was significant because hearing participants needed the previous day's transcripts to correct testimony, refresh their memories and utilize the testimony in preparing to examine or cross-examine subsequent witnesses. Plaintiff's argument that its late deliveries were immaterial and inconsequential is not tenable.

Nor is plaintiff on firmer ground with its argument that defendant is precluded from enforcing the delivery schedule against plaintiff because it did not as rigidly enforce delivery schedules against other contractors. Plaintiff is incorrect in stating that defendant failed to enforce the delivery schedule against other contractors. Defendant's contract with Ace Federal, plaintiff's predecessor, provided for deductions from transcript charges when the transcript was not delivered in a timely fashion. Defendant utilized this provision to reduce payments otherwise owing to Ace on several occasions, just as with plaintiff.

▮ Even assuming that defendant did not enforce its delivery schedule against the prior contractor, it is well settled that the allowance of deviations from the contract to a prior contractor does not require that the same deviations be granted to a subsequent contractor. *Southwest Welding & Manufacturing Co. v. United States*, 206 Ct.Cl. 857, 513 F.2d 639 (1975). Rather, it must be established that defendant took some action to induce the contractor to believe that defendant would continue to refrain from insisting on compliance with the contract before defendant is precluded from insisting upon compliance in subsequent contracts. *See generally Harvey Radio Laboratories, Inc. v. United*

*States,* 126 Ct.Cl. 383, 392 n. 4, 115 F.Supp. 444, 449 n. 4 (1953), *cert. denied,* 346 U.S. 937, 74 S.Ct. 377, 98 L.Ed. 425 (1954). In the instant case, defendant did nothing to indicate it would not insist on strict compliance with the delivery schedule. Defendant took deductions from plaintiff's invoices in cases where plaintiff failed to make timely delivery. Most significantly the contracting officer's technical representative, began placing notations on plaintiff's delivery receipts shortly after the contract award in cases where transcripts were not delivered on time. These notations indicated the correct delivery time and pointed out that a late delivery constituted a default under the contract. As a result, there is simply no basis for plaintiff to argue that it believed that defendant would not insist upon strict compliance with the delivery schedule, regardless of defendant's actions in dealing with the timeliness of deliveries from prior contractors. Defendant bargained for timely delivery of transcripts and fully informed plaintiff that it would insist upon compliance with the delivery schedule. Defendant was entirely justified in using plaintiff's failure to make timely deliveries as a ground for the termination of the contract.

### Personnel Security Clearances

The third reason given by defendant to justify its termination for default of plaintiff's contract was plaintiff's failure to make progress in obtaining personnel security clearances. The request for proposals, later a part of the contract, at clause C.29, as amended, and C.30, *supra,* stated that NRC work involved access to classified information and that contractor personnel would all be required to have top secret clearances. On January 28, 1980, shortly after award of the contract the NRC Security Branch gave plaintiff several packets containing security forms to be completed by plaintiff's employees. There was testimony from defendant that the security forms usually take from a few hours to several weeks to complete. On February 19, 1980 the Chief of the Branch of Security called plaintiff to determine the status of the forms. Plaintiff reported that the forms had been received and while no work had been done on them so far they would all be completed by the following day, February 20, 1980. On March 20, 1980 the security forms had still not been received by defendant, and when questioned by the contracting officer, the excuse given by plaintiff was that a fingerprint pad could not be located. Defendant immediately told plaintiff where it could find fingerprint pads in several NRC offices.

■ Another month passed and only two of plaintiff's employees had completed the security packets and no employee had yet been cleared. By the time the contract was terminated, on May 2, 1980, the court finds that defendant had received only two completed personnel security forms. Plaintiff alleged that it had submitted five personnel security clearance packages by March 25, 1980, and plaintiff's owner had determined, on his own, that only five were needed under the contract notwithstanding the requirement that all employees have clearances. There is no indication in the record as to how many employees plaintiff had at any given time. At one point, he only had five employees, but it appears that as time passed more employees were hired. The court finds that plaintiff was derelict and in default for not completing the required security documents in a timely fashion. Such failure was a clear violation of the default clause, paragraph 11(a)(ii) of the general provisions which authorizes defendant to terminate for default any contractor who "fails to make progress as to endanger performance of this contract in accordance with its terms." No acceptable reason was ever given by plaintiff for its failure to meet this condition of the contract.

Plaintiff argued strenuously against the three reasons for default given by the contracting officer to which this court has given close scrutiny. Plaintiff also raised three additional arguments. They were (1) that the government breached its contract with plaintiff by failing to order plaintiff to transcribe all hearings held by the several

NRC groups in Lot. No. 1, (2) that the government took payment discounts to which it was not entitled, and (3) that the termination for default was procedurally defective because plaintiff was not given the proper cure notice as required in the contract and the procurement regulations.

### Reporting and Reproducing

Plaintiff argued that paragraph F.1 of the contract requires defendant to order from plaintiff all reporting services for hearings held at NRC Headquarters with the exception of certain closed meetings of the Commissioners. Paragraph F.2 provides that the contractor may be given as short as a two-hour notice of meetings in the Washington, D.C. Metropolitan area. Defendant took the position that if plaintiff had to be given a two-hour notice or less that it did not have to call for plaintiff's services, but could instead use one of its own employees to report the meeting. Defendant admits that its own reporter did report hearings called in cases where there was less than a two-hour notice.

█ This particular issue was never submitted to the contracting officer for decision as required by the Contract Disputes Act, 41 U.S.C. § 605 (1982). That Act requires that "[a]ll claims by a contractor against the government relating to a contract shall be in writing and shall be submitted to the contracting officer for a decision." 41 U.S.C. § 605(a) (1982). Plaintiff's failure to present this claim to the contracting officer effectively takes it outside of the jurisdiction of this court. *Paragon Energy Corp. v. United States,* 227 Ct.Cl. 176, 177, 645 F.2d 966, 967 (1981). The requirement for a final conclusion by the contracting officer applies directly to a termination for default case, as here. *Milmark Services, Inc. v. United States,* 2 Cl.Ct. 116 (1983), *aff'd,* 731 F.2d 855 (Fed. Cir.1984).

█ There is a second part to this claim, wherein plaintiff claimed defendant breached the contract by not ordering all of the copies of the transcripts needed by defendant from plaintiff. Plaintiff failed to develop this issue to any degree, possibly because of paragraph F.1, which rendered the claim untenable. Paragraph F.1 stated bluntly that: "The Commission at all times shall have the right to reproduce transcripts furnished under this contract, or copies thereof, when such reproduction is deemed necessary." An argument could be made that defendant need not have photocopied all, or most or even any of the transcripts but for the fact that the Inspector General of NRC had concluded that it was less expensive for defendant to photocopy the transcripts as opposed to plaintiff. This satisfies the court that in-house reproduction was "deemed necessary." Paragraph J–13 of the contract also, in no uncertain terms, stated that: "The Commission retains the right to reproduce in full and distribute any transcript received under the terms of this contract."

█ As indicated above, the contract did not obligate defendant to order any, much less all, reproduction services from plaintiff. If plaintiff failed to understand its rights under the contract when preparing its bid it did so at its own peril. All contractors are bound to understand the complexities and consequences of their undertakings. *Tony Downs Foods Co. v. United States,* 209 Ct.Cl. 31, 42, 530 F.2d 367, 374 (1976).

### Payment Discounts

█ The contract provided defendant a 10% discount on invoices paid within 20 calendar days. The 20–day time period began to run from the date the invoice was delivered to the Division of Accounting, NRC, and ended on the date the check was mailed to plaintiff. Plaintiff contended that some invoices were not paid within the 20–day time period because it was directed in a few instances to deliver the invoice to some person or office other than the Division of Accounting. Defendant refuted this entirely and pointed out that the contract at clause R.2.(a) directed plaintiff to deliver the vouchers to the Division of Accounting and that all invoices were paid

within the 20–day period from the date the invoices were received by the Division of Accounting. Plaintiff, on the other hand, alleged that it was told by the contracting officer to deliver the invoices "to her or her representative, and not to the Division of Accounts." Defendant acknowledged that in a few instances plaintiff may have given invoices to the contracting officer or someone on her staff, but that all invoices were addressed and delivered to the Division of Accounting either the same day or early the next day. Plaintiff admitted it had only cursory knowledge of how invoices were processed whereas defendant was adamant in its protestations that it never told plaintiff to deviate from the terms of the contract which called for delivery to the Division of Accounting, notwithstanding the admission by the contracting officer that she or someone on her staff "might" have received the invoices. The court finds that the discounts were properly taken in that, even though the contracting officer, or member of her staff directed otherwise, that the vouchers be delivered to their office, payments were made within 20 days of receipt of the vouchers by the Division of Accounting.

The answer lies in clause 9(b) of the Solicitation Instructions and Conditions, to wit: "time will be computed from the date [the] correct invoice or voucher is received in the office specified by the Government," which it was, and that "payment is deemed to be made for the purpose of earning the discount on the date of mailing of the Government check." The court is of the opinion that the discount period began to run from the date, "the correct invoice or voucher [was] received in the Division of Accounting." Because the contracting officer or someone on her staff directed plaintiff to deliver the invoice to them, a breakdown in communication existed, at the least, which should be dealt with by defendant as a disciplinary matter and not this court because the improper delivery consumed no more than one day at the most.

*The "Cure" Notice*

Plaintiff alleged that the termination for default was procedurally defective because it was not given the proper cure notice as required in the contract and the procurement regulations.

The court rejects this assertion. Considering the total sum of the testimony given at trial, plaintiff cannot seriously argue that it was prejudiced by the failure of defendant to notify it in greater detail than was done in the April 16, 1980 cure notice. The notice required by the default clause is intended to inform the contractor that it has failed to meet one or more terms of the contract, except for the delivery clause, as perceived by the government at the time. It need not cite each and every failure, but it must list with enough particularity the performance failures which have placed the contractor in danger of termination for default. Where the plaintiff has received prior notice of its failures, whether by telephone, letter, or word of mouth, that information will be considered properly in conjunction with the cure notice. *Finast Metal Products, Inc.*, 77–1 B.C.A. ¶ 12,331 (1977). *See also National Rag & Waste Co. v. United States*, 237 F.2d 846, 847–48 (5th Cir.1956) and *RFI Shield-Rooms*, 77–2 B.C.A. ¶ 12,714 (1977).

Three letters form the substance of this issue. The first is a letter dated February 15, 1980, *supra*, 26 days after award, from the contracting officer to plaintiff. It was clearly not a cure notice but it did complain about one transcript that had to be returned to plaintiff for correction under clause F.1 e.(2) of the contract, which required plaintiff to correct unintelligible transcripts where the error ratio was at least 1:100 words. The contracting officer also complained of three late transcripts that plaintiff had delivered to guards during non-duty hours, and instructed plaintiff to cease doing so. Several other matters involving alleged problems with plaintiff's performance and stenographic reporting procedures were also referenced in the February 15, 1980 letter. The contracting officer then went on to point out all of the

effort that defendant had given plaintiff and expressed concern about plaintiff's "lack of preparation to perform satisfactorily."

On April 16, 1980, the contracting officer issued a written document entitled "Delinquency of Contract No. NRC–17–80–488–01, 'Stenographic Reporting Services (Lot # 1)'". The April 16 letter recapitulated what had been discussed with plaintiff at a March 19, 1980 meeting. The April 16, 1980 letter read as follows:

> On March 19, 1980, a meeting was held at the Nuclear Regulatory Commission (NRC) to discuss the performance of and transcripts submitted by your company. At that meeting, the NRC participants discussed their concerns that a majority of the transcripts contained garbled and misleading statements, inaccuracies in the reporting of simple technical terms and lack of conventional punctuation. Also discussed was the impact of the late deliveries of transcripts on the Commissioners' meetings, the Atomic Safety and Licensing Boards, the Atomic Safety and Licensing Appeal Boards, and the Advisory Committee on Reactor Safeguards hearing review processes.
>
> It is imperative that the contract specifications, terms and conditions be adhered to and that the transcripts submitted by your company are received by the delivery date specified and are in an acceptable form. Continually submitting transcripts not in conformance with the required specifications and the delivery dates specified has resulted in an unfavorable performance record by your company.
>
> Since you have failed to make sufficient progress in requesting security personnel clearances, failed to make delivery within the time required and failed to submit all transcripts in conformance with the terms of the contract, the Government is considering terminating said contract pursuant to the contract General Provisions, Article 11, 'Default.' Pending a final decision in this matter, it will be necessary to determine whether your failure to perform arose out of causes beyond your control and without fault or negligence on your part. Accordingly, you are hereby afforded the opportunity to present, in writing, any facts bearing on the question to me within ten (10) days after receipt of this notice....

■■■■ Note the reference to "garbled and misleading statements, inaccuracies in its reporting of simple technical terms and a lack of conventional punctuation" in the first paragraph of the April 16, 1980 letter. This unequivocably, was a 10–day cure notice.[6] The record shows beyond doubt, and the court finds, that plaintiff knew full well what those complaints specifically related to. The court finds that in the Rancho SECO hearing, for example, there were many misspellings of technical and non-technical terms and of witnesses' names, even though the reporter had a list of witnesses' with their names spelled correctly. Moreover, the tape machine broke at one point during the hearings and a half-hour of testimony was lost. It was inexcusable that a back-up tape machine was not available and that defendant was not informed of the breakdown. Words, were added to the transcript that were not spoken and words not reported that were spoken. The court also finds that the hearings "format" was wrong which at times denied readers of the usual benefit of using the transcripts as a table of contents of the proceedings. NRC Reviewers and review boards were also hampered by these fail-

---

**6.** It should be noted that the default clause of the contract does not require a cure notice if the delivery dates under the contract are not met. In that circumstance, the contractor may be terminated for default without any prior notice. However, once the contracting officer decides to terminate a contract for default for reasons other than late delivery and does issue the required cure notice, the contracting officer may not thereafter terminate the contract for default for late deliveries, but must wait the requisite number of days given in the cure notice to see if the default is cured or not. If not, the contracting officer may then terminate the contract for default.

ures of plaintiff to perform as called for in the contract.

 Plaintiff knew of its problems, as outlined in the April 16, 1980 cure notice, but was unable to overcome them. Plaintiff failed to respond to the issues contained in the April 16, 1980 cure notice. Instead of joining issue with defendant, plaintiff argued that defendant was and had been all along in continuing breach of the contract.[7] Once the 10–day cure notice was issued to plaintiff, its failure to correct, explain or communicate with defendant during the period what corrective action that would be taken, justified a termination for default. *Tubular Aircraft Products, Inc. v. United States*, 213 Ct.Cl. 749, 750, 566 F.2d 1190 (1977). Here plaintiff made absolutely no attempt to dispel defendant's concerns, or to even answer the charges. Instead plaintiff wrote a letter to defendant on April 25, 1980, which failed in all respects to reply to the issues raised by defendant; it charged defendant with breach of contract, and said not one word about how the deficiencies had been or would be cured. Defendant's cure notice was satisfactory when coupled with prior conversations and letters to plaintiff.

## CONCLUSION

Following an extensive analysis of the transcript of the trial and all other evidence, pleadings and briefs, the court finds that plaintiff has failed to show that the defendant acted in an arbitrary and capricious manner or that defendant procedurally violated the law and regulations so as to prejudice plaintiff in terminating plaintiff's contract for default. The contract required plaintiff to perform in accordance with the best standards of the reporting profession but the evidence overwhelmingly shows that plaintiff failed to do that. Plaintiff failed to live up to its end of the bargain.

All of the factual and legal issues discussed herein show consistent and substantial breaches of the contract by plaintiff. When a contractor, without legal or factual excuse fails to carry out the terms and conditions of its contract, it is in breach of contract and defendant has an unfettered right to terminate the contract for default. The impact of a termination for default is severe, and regretfully, sometimes fatal to the contractor.

The court finds that defendant acted within the bounds of propriety. The termination for default was proper under the circumstances and will not be converted to a termination for the convenience of the government.

The Complaint shall not be dismissed until defendant's counterclaim for reprocurement costs is disposed of. The parties may agree or stipulate to the amount of the counterclaim or, failing to do so, notify the court. The court will then arrange for argument or trial, whichever is appropriate. The parties are given 30 days from the date of this Opinion to dispose of the counterclaim or to report to the court that they are unable to do so.

---

7. It is true that the contracting officer could have given plaintiff more time to cure its deficiencies, but this court will not substitute its judgment for that of defendant. *Northrop Carolina, Inc. v. United States*, 213 Ct.Cl. 670, 553 F.2d 105 (1977). Moreover, the extent of detail to be listed in a cure notice is not set in concrete. Each case is to be analyzed carefully by defendant and, in turn, by this court.