**STATE OF FLORIDA, DEPARTMENT OF INSURANCE, as Receiver for Southeastern Casualty & Indemnity Insurance Company, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 93–29 C.**

United States Court of Federal Claims.

March 9, 1995.[1]

---

**1.** This Opinion was filed unpublished on March 9, 1995. Thereafter, defendant filed a request for Publication pursuant to Rule 52.1(b). We granted the motion, and reissue the Opinion for publication this date, April 24, 1995.

Jack Rephan, Norfolk, VA, for plaintiff.

Mathew S. Rosengart, U.S. Dept. of Justice, Washington, DC, for defendant.

## OPINION

HODGES, Judge.

This case is an action to set aside a default termination as improper and to convert the termination to one for the convenience of the government. For the reasons set forth below, we affirm the termination for default.

### I. Background

Defendant awarded Padula Construction Company a $2 million fixed-price construction contract to build a new main Post Office in Jupiter, Florida in September 1987. Padula received a notice to proceed in October. The contract completion date was October 1988. In accordance with the requirements of both the contract and the Miller Act, Padula agreed to furnish performance and payment bonds. The bonds were issued through Southeastern Casualty & Indemnity Insurance Company.

During the first year of Padula's performance, the Postal Service voiced concerns regarding Padula's progress and its ability to complete the contract. In early October 1988, Padula's performance deteriorated to the point that it had effectively ceased work on the project. The Postal Service issued a show cause letter on October 4 notifying Padula that it was considering terminating the company's right to proceed. Padula did not respond and took no action to address the concerns of the Postal Service. Accordingly, the Postal Service terminated Padula's right to proceed on October 18, 1988. Defendant sent a copy of the termination letter to Southeastern on the same day.

Southeastern provided the Postal Service with a surety takeover notification on October 26. The takeover agreement provided that Southeastern would use its best efforts to complete all of the work on the contract according to the original contract plans and specifications. It agreed to deliver a written strategy for completing the project within two weeks. The plan insured that the existing contract would remain in full force and effect, monthly progress payments would include the same schedule of values as the original contract, and that Southeastern would submit a revised project schedule to the Postal Service within ten days. The Postal Service did not establish a new completion date at this meeting or at any time thereafter.

In November, representatives from Southeastern and Gee & Jenson, the Postal Service's architect, visited the construction site to determine the status of the project. Gee & Jenson identified twenty-one areas and items requiring corrective work.

Shortly thereafter, the Postal Service expressed concern about Southeastern's lack of progress and requested a strategy for completion of the project. It also requested the schedule that Southeastern had agreed to deliver at the October 26 meeting. In response, Southeastern promised to provide the formal contract schedule and completion procedure, as well as its contractor selection, by the end of December. Southeastern never submitted either an adequate project schedule or a plan for completion.[1]

Southeastern had not advanced the project's completion by December 27. On that date, Gee & Jenson informed Southeastern that damage was being caused to parts of the structure due to exposure to the elements. In particular, the architect was concerned about water infiltration because the roof was not complete and because the structure had not been enclosed. Gee & Jenson also informed Southeastern of additional areas requiring corrective work. Southeastern took no action and did not cover the roof. As a result, the structure continued to deteriorate from its exposure to wind and rain.

Subsequently, the Postal Service told Southeastern that it was concerned about Plaintiff's lack of response and its failure to obtain a new general contractor. Again, the Postal Service requested the schedule for

---

1. A proposed construction schedule was submitted by the completion contractor, Frank Maio General Contractors, Inc., on February 14, 1989. This document was not a true schedule, however, but an outline that was not in the proper format.

completion that Southeastern had agreed to provide earlier.

The Postal Service was informed at a February 1989 meeting that Southeastern had chosen Frank Maio General Contractors to complete the contract. The Postal Service was not given an opportunity to review and approve Maio beforehand, as provided in the contract. The Postal Service reiterated its many concerns about the project and requested schedules for progress and completion—now almost three months overdue. None of the corrective work or deterioration previously identified had been corrected. The roof remained uncovered and the building continued to sustain damage. Only one contractor was on the job in February 1989 and that contractor was concerned mostly with security and sweeping floors.

Maio subcontracted the roofing work in March. Gee & Jenson visited the project site on March 23 and found that for all intents and purposes no work was in progress. The roof was still incomplete.

In early April, the Contracting Officer became aware that Southeastern had failed to meet the standards required of sureties on federal projects. As a result, it was likely that the Department of Treasury would revoke Southeastern's certificate of authority to act as a federal bond surety. Accordingly, the Contracting Officer requested a meeting with Southeastern to discuss the company's lack of progress and to discuss its danger of being terminated. At the April 18 meeting, Southeastern replied to the Postal Service's concerns by stating that it had no obligation to keep the Postal Service informed of its progress.

The Contracting Officer sent Southeastern a letter on April 25 informing the surety of imminent termination. Southeastern responded again that the surety's only responsibility was "to ensure the completion of the contract." By May 12, Southeastern had increased the project's percentage of completion by only ten percent from where it stood after Padula's termination.

In May, the Contracting Officer consulted with a technical representative, attorneys, and other staff to determine whether Southeastern should be terminated. He examined all relevant documents concerning Southeastern's role in the project, and also reviewed the United States Postal Service Procurement Manual.

The Postal Service terminated Southeastern for default on May 12. The same day, the Department of Treasury revoked Southeastern's certificate of authority and removed it from the list of qualified federal sureties. Southeastern protested the default termination to the Contracting Officer, who ruled for the Postal Service. Plaintiff then filed suit in this court seeking to invalidate the default termination and convert it to a termination for convenience. We find that the termination for default was proper.

## II. Discussion

■ Southeastern was responsible for completion of the project after Padula's default. *Dependable Ins. Co. v. United States,* 846 F.2d 65, 66 (Fed.Cir.1988). Shortly after the October 26, 1988 meeting, Southeastern submitted a surety takeover notification to the Postal Service, and agreed to use its best efforts to complete all the work on the contract according to the original contract plans and specifications. In exercising this option to complete the contract, Southeastern stepped into the shoes of Padula. In essence, it became the contractor. *Travelers Indemnity Co. v. United States,* 16 Cl.Ct. 142, 153 (1988); *Aetna Casualty & Surety Co. v. United States,* 845 F.2d 971, 974 (Fed. Cir.1988).

■ Regulations governing the termination for default in this case are set forth in the United States Postal Service Procurement Manual (USPSPM), Publication 41 (1987). This Manual governs all procurements of property and services made by the Postal Service. 39 C.F.R. § 601.102. It is issued pursuant to statutory authority, and therefore has the force and effect of law. 39 U.S.C. § 401; *DeMatteo Construction Co. v. United States,* 600 F.2d 1384, 1391, 220 Ct. Cl. 579 (1979).

The Manual provision covering termination for default of fixed-price contracts provides:

Under the Termination for Default Clause, the Postal Service has the right ... to

terminate all or any part of a contract without regard to severability or contract obligations when the contractor:

(1) Fails to complete any material requirement of the contract within the time specified in the contract (including any extensions);

(2) Fails to make progress to a degree that this failure endangers performance of the contract;

(3) Fails to perform any other contract provision; or

(4) Fails to give adequate assurances as required by 6.2.5.

USPSPM 6.9.3.b. Violation of any of these provisions is sufficient grounds for a termination for default. USPSPM 6.9.3.

Defendant cited Southeastern's failure to make adequate progress, to perform several contract provisions, and to give adequate assurances, as reasons for terminating plaintiff for default. Plaintiff argues that the default termination was improper because: (1) the notice of default termination was defective; (2) delays causing default were excusable; (3) the Contracting Officer abused his discretion in terminating plaintiff for default; and (4) defendant waived its right to terminate for default.

### A. Formal Defects in the Termination for Default Notice

Plaintiff argues that the termination for default should be converted to one for convenience of the government.[2] The basis for this assertion is that the notice of default did not contain a mandatory clause stating plaintiff's appeal rights under the Contracts Dispute Act.

The Manual states that all final decisions issued by contracting officers regarding contract disputes must contain a paragraph that sets forth the contractor's appeal rights. USPSPM 6.8.3.g. The notice of default termination issued by the Postal Service to Southeastern did not contain this clause.

 We find the lack of such a paragraph in the termination notice a technical deficiency that is insufficient to overturn a decision otherwise properly made. The focus of decisions which address technical deficiencies of a contracting officer's final decision is the harm to the plaintiff. *Transamerica Ins. Corp. v. United States*, 28 Fed.Cl. 418, 423–24 (1993). In *Philadelphia Regent Builders v. United States*, 634 F.2d 569, 225 Ct.Cl. 234 (1980), a contractor sought to have a default termination nullified and converted to one for convenience because of technical deficiencies in the notice of default termination, including an incorrect contract number, failure to include appeal rights, and the lack of a signature by the contracting officer. The court stated that while it did not "favor sloppy practices nor approve of violations of the procurement regulations," it would *not nullify a valid termination for default solely because of "harmless technical defects." Philadelphia Regent Builders*, 634 F.2d at 572–73. To do so would "grant plaintiff an entirely unwarranted windfall." *Id.* 634 F.2d at 573. In particular, the court noted that the omission of the appeal rights did not harm the plaintiff because he was able to file a timely appeal.

Plaintiff was not "harmed" by the omission of its appeal rights in the notice of default termination because Southeastern received a final decision and its appeal was heard in this court.[3]

---

**2.** The Manual states: "If the contractor can establish that its failure to perform arose out of causes beyond its control and without its fault or negligence, ... the termination for default will be deemed a termination for convenience...." USPSPM 6.9.3.a.2.

**3.** Plaintiff claims harm in that two of Southeastern's agents, Mr. Kennedy and Mr. Ohlson, are now deceased. According to plaintiff, it has suffered prejudice because had Southeastern been timely advised of its appeal rights it would have used testimony of both these men to provide the court with a clear picture of what occurred. We find no such prejudice. Although Mr. Ohlson was not available to testify, numerous daily reports written by him allege mismanagement on the part of Southeastern and its agent, All–American. Numerous documents and correspondence, including those sent to and by Mr. Kennedy, provide this court with sufficient evidence of what occurred. In addition, numerous employees of Southeastern and its agent CPC were available as witnesses. Plaintiff did not call many of these witnesses.

Plaintiff cites the legislative history of the CDA to show that the notice of appeal rights is especially important "for small contractors who may not be well versed in Government contracting procedures." *Contract Disputes: Hearings on H.R. 664 and Related Bills Before the Subcomm. on Administrative Law and Governmental Relations of the House Comm. on the Judiciary,* 95th Cong., 1st Sess. 253 (1977). Plaintiff contends that it is very much like a small contractor and that it was not familiar with government contracting appeal procedures.

The record shows, however, that plaintiff should have been aware of its appeal rights. Although plaintiff's appeal rights under the CDA were omitted from the default notice, they were explicitly spelled out in the contract. In fact, Southeastern's claims adjuster read the Claims and Disputes language contained in the October 16, 1988 notice of termination to Padula. Furthermore, neither Southeastern, a large federal bond surety, nor the State of Florida can claim similarity to small government contractors who are likely to be ill-versed in government contracting procedures.

■ The Procurement Manual is issued pursuant to statutory authority, and it has the force and effect of law. As a result, applicable provisions must be interpreted as terms of the contract, irrespective of whether they were expressly set forth in the contract. *DeMatteo,* 600 F.2d at 1391.

Accordingly, plaintiff knew or should have known of its appeal rights under the Contracts Disputes Act. If plaintiff did not know of its appeal rights, plaintiff was not "harmed" by the omission of its appeal rights in the notification of default because plaintiff found its way to this court.

### B. Failure to Make Progress

■ Southeastern's failure to make progress to a degree that endangered performance of the contract is one of the grounds cited by defendant for the default termination. The propriety of a termination under this provision can be supported in a number of ways.

In *Discount Co. v. United States,* 554 F.2d 435, 441, 213 Ct.Cl. 567 (Ct.Cl.1977), *cert.*

*denied,* 434 U.S. 938, 98 S.Ct. 428, 54 L.Ed.2d 298 (1977), the court found that a contractor failed to make adequate progress because it did not assure the Government of timely delivery and did not submit a project schedule. Specifically, the court noted that the lack of an adequate schedule indicated that the contractor was not ready, willing, or able to make progress. Also, the contractor's failure to provide a schedule served to support the Government's position that it was justifiably insecure about the contract's timely completion. *Discount,* 554 F.2d 435; *See K & M Construction,* ENG No. 2998, 72–1 B.C.A. (CCH) ¶ 9366, 1972 WL 1185 (1972) (failure to make progress where no submission of a requested revised progress schedule).

Other factors such as the contractor's percentage of completion at the time of default, problems and delays in securing necessary subcontractors, and the lack of timely responses to concerns expressed by the Postal Service are also relevant. Southeastern exhibited all of these problems. After seven months on the project, it advanced the percentage of completion of the project by only ten percent. Furthermore, Southeastern encountered numerous problems and delays in bidding out the project. It took more than three months to hire a general contractor, and even longer for a roof subcontractor. Finally, Southeastern did not respond to defendant's concerns.

Applying these standards, Southeastern's termination was proper. Despite repeated requests from the Postal Service, Southeastern did not provide an adequate schedule or an overall completion plan or strategy. It was reasonable for the Postal Service to believe that performance of the contract was endangered.

### C. Waiver of Defendant's Right to Terminate for Default

Plaintiff contends that defendant waived its right to terminate the contract for failure to make progress because it did not act within a reasonable time. The record shows that the original October 1988 date for completion of the project by Padula had passed prior to execution of the takeover agreement

by Southeastern. Plaintiff argues that it should have been given a reasonable time to complete the project because a new completion date was never established.

Defendant did not set a new completion date unilaterally. However, it did seek a project schedule from Southeastern so that the Post Office could set a reasonable completion date. Southeastern promised to deliver a revised project schedule and a revised list of subcontractors by early November 1988. It did not do so. The Postal Service notified Southeastern of its concerns about the Progress Completion Schedule. At the December 1 meeting, Southeastern again agreed to provide a formal project schedule, a formal completion procedure, and its contractor selection. No schedule or procedure of any type was submitted to defendant until Maio provided a "proposed" construction schedule in mid-February 1989.

Defendant repeatedly expressed its concerns regarding Southeastern's failure to provide a project schedule and to address construction problems identified at the project site. The Postal Service put Southeastern on notice of the possibility of termination and demanded assurances from Southeastern that it would complete the project. These actions by the Postal Service show that time was of the essence. Testimony of the Contracting Officer supports this interpretation.

█ In addition, Southeastern refused to provide the adequate assurances required by USPSPM 6.2.5 that it was ready, willing, and able to complete the project in a timely manner. Southeastern's failure to provide such assurances provided grounds for termination.

### D. Excusable delay

█ Southeastern raises excusable delay as a defense to defendant's allegation of failure to make progress. Plaintiff contends that delays caused by unexpected corrective work, and the Postal Service's failure to inspect and to notify Southeastern of the extent of the corrective work, excuse Southeastern's failure to make progress. We do not agree.

The Termination for Default Clause states that a delay is excusable if it "arises from unforeseeable causes beyond the control and without the fault or negligence of the contractor ... including acts of the Government in its contractual capacity." The record shows that the delays and causes alleged by Southeastern do not fall under this exception.

Because Padula was terminated for default, the possibility that corrective work would be required was not unforeseeable. If the extent of the corrective work required for completion was greater than Southeastern originally anticipated, this does not affect the foreseeability of such work's being necessary.

█ If the Postal Service did not exercise its contractual rights fully, this does not relieve Southeastern of its responsibilities under the contract to deliver an acceptable product. *Opto Mechanik, Inc.,* ASBCA No. 30690, 90–3 B.C.A. (CCH) ¶ 23,165, 1990 WL 133138 (1990). The failure of a government inspector to notify a contractor of defects does not relieve the contractor from contract requirements or excuse default resulting from delay caused by the corrective work. *Holt Roofing Company, Inc.,* GSBCA No. 8270, 91–1 B.C.A. (CCH) ¶ 23,361, 1990 WL 146372 (1990). Accordingly, even if the Postal Service's inspection were negligent, and we have no evidence that it was, this would not excuse Southeastern from its responsibility to perform adequate inspections and to produce an acceptable product. *See Opto Mechanik, Inc.,* 90–3 B.C.A. ¶ 23,165, 1990 WL 133138. In any event, Gee & Jenson identified numerous areas requiring corrective work on at least two occasions in November and December 1988.

The record contains many examples of Southeastern's acts or omissions which caused or contributed to the delay. For example, Southeastern did not obtain a general contractor to complete the job until more than three months after Padula's termination. Delay caused by water damage resulted from exposure to the elements because of the incomplete roof. Southeastern could have completed the roof per contract specifications, or it could have covered the roof with a tarp or some other material to provide temporary protection until the roof could be completed. Southeastern's failure to address the roof issue until months after

the takeover is indicative of its negligent behavior. As a result of this inaction, the structure suffered substantial damage beyond the original corrective work.

Southeastern has not met its burden of establishing that any delays were unforeseeable, beyond its control, and without its fault or negligence. The delays are not excusable.

E. Failure to Perform Contract Provisions

■ The contract's Termination for Default Clause allows the Postal Service to terminate a contract for default if the contractor "fails to perform any other contract provision." A default termination under this clause will be sustained only if the contractor fails to perform a material contractual obligation. *Jerry Wooton dba J & C Salvage*, AGBCA No. 86–226–3, 87–2 B.C.A. (CCH) ¶ 19,705, 1987 WL 40742 (1987).

Southeastern failed to comply with several contract provisions. It did not submit a satisfactory progress chart or completion plan, which is "grounds for determination by the Contracting Officer that the Contractor is failing to prosecute the work with such diligence as will ensure its completion within the time specified" under Clause 65(c) of the contract. Clause 11(d) requires the contractor to notify the Contracting Officer in writing of the causes of delay within ten days. Southeastern never notified the Postal Service of the causes of delay in the manner provided for in the contract. Finally, despite its contention that the Postal Service delayed its progress on the project, Southeastern did not request a time extension to complete the project as required by the contract. All three of these violations represent material contractual obligations. *See Jerry Wooton*, 87–2 B.C.A. ¶ 19,705, 1987 WL 40742.

F. Contracting Officer Abuse of Discretion

■ To support its allegation that the Contracting Officer abused his discretion in terminating Southeastern for default, Southeastern must establish that the decision was arbitrary and capricious. *International Verbatim Reporters v. United States*, 9 Cl.Ct. 710, 715 (1986). The decision to terminate a contractor is a discretionary decision based on the business judgment of the contracting officer. *See* John Cibinic, Jr. & Ralph C.

Nash, Jr., *Administration of Government Contracts* 698 (2d ed. 1986). The Contracting Officer reviewed all pertinent documents, and consulted with technical personnel and legal counsel as required by the Procurement Manual. This court cannot substitute its judgment for that of the contracting officer. *International Verbatim*, 9 Cl.Ct. at 715. If we could, we would find that his decision to terminate for default was justified. Southeastern has not established that the Contracting Officer abused his discretion.

### Conclusion

Plaintiff breached material provisions in its contract with the Postal Service. By its actions and inactions, plaintiff caused or contributed to delays that resulted in its failure to make progress. None of the causes of delay set forth by plaintiff are excusable. Except for certain technical omissions, the Contracting Officer followed the appropriate procedures prior to issuing the default termination. Accordingly, the Contracting Officer's decision to terminate plaintiff was justified. The Clerk will enter judgment for defendant. No costs.